UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ISAAC HERNANDEZ, | : | CIVIL ACTION NO.: |
|     Plaintiff | : | 3:17-cv-1857-VAB |
| | : | |
|     v. | : | |
| | : | |
| APPLE AUTO WHOLESALERS OF | : | |
| WATERBURY LLC and WESTLAKE | : | |
| SERVICES, LLC d/b/a WESTLAKE | : | |
| FINANCIAL SERVICES, | : | |
|     Defendants | : | SEPTEMBER 6, 2019 |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

Plaintiff Isaac Hernandez ("Plaintiff"), by his attorneys, submits this memorandum of law in support of two motions. First, Plaintiff seeks a default judgment against the defendant Apple Auto Wholesalers of Waterbury LLC ("Apple Auto"), which is in default for failure to appear and answer the Complaint. Plaintiff also moves for summary judgment with respect to the defendant Westlake Service, LLC d/b/a Westlake Financial Services ("Westlake"). As detailed below, Westlake does not oppose the factual basis for summary judgment but contests that it is liable for Plaintiff's claims against Apple Auto. However, Apple Auto is liable for Plaintiff's breach of warranty and CUTPA claims, including claims for attorney's fees, in an amount up to the amount paid by Plaintiff plus the balance owed under the retail installment contract. This total cap on Westlake's liability is $14,442.13.

## II.     PROCEDURAL HISTORY

Plaintiff brought this action against Apple Auto for violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.,* and for breach of the implied warranty of merchantability under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.* and Article 2 of the Uniform Commercial Code ("UCC"), Conn. Gen. Stat. §§ 42a-2-101 *et seq.*  Plaintiff also asserted pendent state law claims for violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110 *et seq.* Westlake was named as a defendant because it was the assignee of the retail installment contract (the "Contract") between Apple Auto and Plaintiff.

Plaintiff commenced this action on November 3, 2017. Counsel appeared for the defendants and answered the complaint, but moved for leave to withdraw on June 25, 2018 (No. 42). The Court granted the motion on August 17, 2018 (No. 47), and new counsel appeared for Westlake. New counsel did not appear for Apple Auto, and Plaintiff moved for a default for failure to appear on July 1, 2019 (No. 82). The Court granted that motion (No. 83).

The Court referred Plaintiff and Westlake to a settlement conference with USMJ William Garfinkel, who conducted two telephonic conferences. As a result of those conferences, Plaintiff and Westlake agreed that there were no contested issues of fact between them and that they would seek an adjudication of the scope of Westlake's assignee liability by means of a summary judgment motion. Plaintiff submits the summary judgment in accordance with that agreement. Plaintiff also moves for a default judgment against Apple Auto.

### III.    STANDARDS OF REVIEW

### A.  Motion for Default Judgment

In *GE Group Life Assurance Company v. Ruzynski*,[1] the principles applicable to entry of a judgment following default were well-summarized as follows:

> It is well established that a party is not entitled to a default judgment as of right; rather the entry of a default judgment is entrusted to the sound judicial discretion of the court.[2] In civil cases, however, "where a party fails to respond, after notice the court is ordinarily justified in entering a judgment against the defaulting party."[3]

In deciding the extent of damages to be awarded in a default judgment, the court must consider several factors including (1) the monetary award requested; (2) the prejudice suffered by the Plaintiff; (3) whether or not the default is clearly established and (4) the nature of the Plaintiff's claims against the defendant.[4]

With respect to the above criteria, the Second Circuit has provided guidance, stating:

> The outer bounds of recovery allowable are of course measured by the principle of proximate cause. The default judgment did not give [plaintiff] a blank check to recover from [defendant] any losses it had ever suffered from whatever source. It could only recover those damages arising from the acts and injuries pleaded....[5]

---

[1] 2004 WL 243346 (D. Conn. 2004).
[2] *Id.* citing *Cablevision of S. Conn. Ltd. Partnership v. Smith*, 141 F.Supp.2d 277, 281 (D. Conn. 2001) (quoting *Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 615 (2d Cir.1999)).
[3] *Id.* citing *Bermudez v. Reid*, 733 F.2d 18, 21 (2d Cir.1984).
[4] *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1152 n. 11 (2d Cir. 1995) (citing 10 Moore's Federal Practice § 55.20[2][b]).
[5] *Greyhound Exhibit Group, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158-59 (2d Cir. 1992).

"[W]here the quantum of damages is not liquidated and is not a readily ascertainable sum, the plaintiff must prove damages before the entry of a final default judgment."[6] "In reaching the decision as to the amount a plaintiff is entitled to recover, the Court may rely on detailed affidavits or documentary evidence to determine the appropriate sum [to be awarded pursuant to] the default judgment."[7] "A court may enter a default judgment without a hearing only if the amount claimed is a liquidated sum or one capable of mathematical calculation."[8]

However, in making this determination and evaluating the allegations asserted against the defendant, the court may "deem[ ] all the well-pleaded allegations in the pleadings to be admitted" by the defendant.[9] In this case, the Plaintiff has also submitted his Affidavit and the Affidavit of Robert Collins, a disclosed expert witness.

### B. Motion for Summary Judgment

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law.[10]  Once the moving party has met its burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial,"[11] and present "such proof as would allow a reasonable juror to return a verdict in [its] favor"[12]. "Where it is clear that no rational finder of fact 'could find in favor of the

---

[6] *Montcalm Pub. Corp. v. Ryan*, 807 F. Supp. 975, 977 (S.D.N.Y. 1992)
[7] (Internal quotation marks omitted.) *Teamsters Local 639-Employers Health Tr. v. Boiler & Furnace Cleaners, Inc.*, 571 F. Supp. 2d 101, 107 (D.D.C. 2008).
[8] *Hunt v. Inter–Globe Energy, Inc.*, 770 F.2d 145, 148 (10th Cir.1985)(*citing Venable v. Haislip*, 721 F.2d 297, 300 (10th Cir.1983))
[9] *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 108 (2d Cir. 1997).
[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 71–72 (2d Cir. 2016).
[11] Anderson, 477 U.S. at 256.
[12] *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted."[13]  On the other hand, where "reasonable minds could differ as to the import of the evidence," the question must be left to the finder of fact.[14]

## IV.   MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE

Plaintiff has submitted a Local Rule 56(a)(1) Statement (the "Statement") that is supported by his Affidavit and the Affidavit of his disclosed expert witness, Robert Collins, as well as the exhibits to those affidavits. They establish that on July 17, 2017, Plaintiff purchased a 2011 Ford Taurus (the "Vehicle") from Apple Auto pursuant to a retail installment contract that was assigned from Apple Auto to Westlake. Statement, ¶ 2, 7, 12. Although Apple Auto had advertised the Vehicle on its website for $11,495, it utilized a stated cash price of $12,650 in the purchase documents.¶ 1, 4. Although Plaintiff was required to pay, and did pay, a down payment of $1,500, consisting of a cash payment of $500 and a trade-in allowance of $1,000, the Contract and the credit disclosures falsely stated that Plaintiff had paid a cash payment of $1,000. ¶ 3, 5-8. The amount financed under the Contract was $12,206.82. ¶ 9.

Prior to the sale to Plaintiff, the Vehicle had been in two accidents that had not been properly repaired, leaving the Vehicle with structural damage and unsafe to drive.¶ 18-34. Apple Auto would have known of the defects, because, as Mr. Collins states in his report, an automotive professional performing a simple visual inspection would have seen that the Vehicle had been wrecked and poorly repaired. ¶ 32. However, Apple

---

[13] F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994))
[14] Cortes v. MTA N.Y. City Transit, 802 F.3d 226, 230 (2d Cir. 2015) (quoting R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)).

Auto provided Plaintiff with the Connecticut K-208 form in which it certified that it had inspected the Vehicle's body and determined that it was safe. ¶ 13.

Plaintiff was not aware of the prior damage at the time that he purchased the Vehicle. ¶ 35. Immediately after taking delivery, Plaintiff noticed that the Vehicle would shake while being driven and that it would make noises during braking. ¶ 14. He attempted to contact Apple Auto by telephone and by text message in order to have repairs performed, but Apple Auto did not respond. ¶ 15-16. Concerned about the condition of the Vehicle and unable to obtain any response from Apple Auto, Plaintiff paid Robert Collins, an independent auto body expert, $650 to perform an assessment. ¶ 17-18. The inspection was conducted on August 15, 2017, or about a month after the purchase.¶ 18.  Mr. Collins issued his report on August 25, 2017. ¶ 24.

Upon learning of the Vehicle's unsafe condition, Plaintiff returned it to Apple Auto on August 28, 2017 without having made any payments. ¶36, 40. Plaintiff served notice, by his counsel, that he had revoked acceptance of the Vehicle the following day. ¶ 37. The letter included a written demand upon Apple Auto. ¶ 37. Westlake subsequently reassigned the Contract to Apple Auto on October 13, 2017. ¶ 39. The defendants have not refunded the $1,500 downpayment to Plaintiff. ¶ 38.

## V.     PLAINTIFF'S LEGAL CLAIMS

### A.  Truth in Lending Act

Plaintiff's TILA claim is asserted against only Apple Auto.[15] TILA is a remedial, strict liability statute that is to be liberally construed, and it requires no proof of deception or actual damages to obtain relief thereunder.[16]  Any defects in the disclosure process, even technical defects, must be recognized without requiring any proof that the consumer was confused.[17] Congress enacted TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair billing and credit card practices." 15 U.S.C. § 1601(a).[18] TILA is a remedial statute and must be interpreted in favor of the consumer.[19]

Apple Auto violated TILA by its inclusion of the false down payment. Specifically, the contract reflected a $2,000 down payment (comprised of the $1,000 trade-in allowance and $1,000 cash) even though only $500 in cash was requested and paid. The itemization of the amount financed was not accurate, because in reality the cash price of the Vehicle was $500 less than the amount stated and the amount paid as a down payment was also $500 less than the amount stated. The inaccurate itemization of the amount financed is a violation of 15 U.S.C. § 1638(a)(2)(A).

---

[15] Assignees are liable only for TILA violations that are apparent on the face of the credit disclosure. 15 U.S.C. § 1641(a).

[16] *Purtle v. Eldridge Auto Sales*, 91 F.3d 797, 800 (6th Cir. 1996); *McGowan v. King, Inc.,* 569 F.2d 845, 848-49 (5th Cir. 1978); *Redhouse v. Quality Ford Sales, Inc.*, 523 F.2d 1, 2 (10th Cir. 1975) (en banc).

[17] *See Jenkins v. Landmark Mortgage Corp.*, 696 F. Supp. 1089, 1092, 1095 (W.D. Va. 1988) (citing *Powers v. Sims and Levin*, 542 F.2d 1216, 1219 (4th Cir. 1976)).

[18] *See also Gibson v. Bob Watson Chevrolet–Geo, Inc.*, 112 F.3d 283, 285 (7th Cir.1997).

[19] *Frazee v. Seaview Toyota Pontiac, Inc.*, 695 F.Supp. 1406 (D.Conn.1988).

Plaintiff has actual damages as a consequence of this violation. The RISC reflected a cash price of $12,650, although the effective cash price of the Vehicle, once the false down payment is subtracted, was only $12,150. Sales tax was charged on the stated cash price, resulting in an increased payment of $30.74 attributable to the false down payment.

Moreover, this additional sales tax would not have been charged in a comparable cash transaction, because there cannot be an inaccurate itemization of the amount financed in a cash sale; the price is indisputably the total paid by the purchaser, and sales tax is calculated upon that amount. Consequently, the additional sales tax should have been disclosed as a finance charge instead of included as part of the amount financed, because it was charged as an incidence of the extension of credit and meets the definition of a finance charge under 15 U.S.C. § 1638(a)(3). The regulations implementing TILA, known as "Regulation Z," 12 C.F.R. § 226.4(a), provides:

> [t]he finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

The entire sales tax was, however, included as part of the amount financed. Consequently, the amount disclosed as a finance charge in the Contract was understated by $30.74. The calculation of the annual percentage rate was also inaccurate. This wrongful disclosure violated of 15 USC § 1638(a)(3) and (4).[20]

---

[20] *See* Person v. Courtesy Motors, Inc., 2001 WL 34072209 (W.D. Mich. Apr. 5, 2001) (additional sales tax attributable to bogus purchases a finance charge); Thompson v. 10,000 RV Sales, Inc., 31 Cal. Rptr. 3d 18 (Cal. Ct. App. 2005) (over-allowance of trade-in vehicle in cash price was a finance charge).

Plaintiff claims statutory damages of double the finance charge of $4,231.31[21],

capped at $2,000 under 15 USC § 1640(a). Plaintiff is also entitled to actual damages

with respect to the increased sales tax, $30.74, due to the false down payment for

violating 15 U.S.C. § 1638(a)(2)(A). However, actual damages attributable to the

increased sales tax is a component of the return of all sums paid in connection with

revocation of acceptance or rescission of the Contract.

### B.  Breach of Warranty/Revocation

A warranty that the Vehicle was in merchantable condition was implied by the

contract by operation of Conn. Gen. Stat. § 42a-2-314. Apple Auto breached the implied

warranty of merchantability, Conn. Gen. Stat. § 42a-2-314, because the Vehicle would

not pass in trade without objection, was not fit for the purposes that motor vehicles are

ordinarily used, or both. Despite being given a reasonable opportunity to repair the

Vehicle, Apple Auto failed to respond to Plaintiff's attempts to contact him. As more fully

discussed above, the Vehicle was sold to Plaintiff with structural damage rendering it

unsafe to drive. Plaintiff provided Apple Auto with the opportunity to make repairs, but it

refused.

"Under [General Statutes] § 42a–2–314,2 the warranty of merchantability is

implied in any sale of goods by a merchant seller ...To recover under this section, a

plaintiff must prove (1) that a merchant sold goods, (2) which were not merchantable at

the time of sale, and (3) injury and damages to the plaintiff or his property (4) [were]

caused proximately and in fact by the defective nature of the goods, and (5) [that] notice

---

[21] See Exhibit C to Hernandez Affidavit. The actual finance charge is increased by the additional sales
tax, but the $2,000 cap is exceeded even without including that amount.

[was given] to the seller of injury."[22] In this case, Plaintiff elected to revoke acceptance of the Vehicle. "When a buyer justifiably revokes acceptance, he may cancel and recover so much of the purchase price as has been paid."[23]

Section 42a-2-608 of the General Statutes sets up the following conditions for the buyer who seeks to justify revocation of acceptance: (1) a nonconformity which substantially impairs the value to the buyer; (2) acceptance (a) with discovery of the defect, if the acceptance is on the reasonable assumption that the nonconformity will be cured, or (b) without discovery of the defect, when the acceptance is reasonably induced by the difficulty of the discovery or the seller's assurances; (3) revocation within a reasonable time after a nonconformity was discovered or should have been discovered; and (4) revocation before a substantive change occurs in the condition of the goods not caused by their own defects.[24]

Revocation is justified under § 42a-2-608: (1) the Vehicle has structural damage and is unsafe to drive; (2) Plaintiff accepted the Vehicle without discovery of the defect; (3) revocation occurred shortly after discovering the defect and after opportunity of Apple Auto to cure it and (4) the Vehicle's condition had not changed since acceptance.

Alternatively, Plaintiff was also entitled to revoke acceptance for fraud or material misrepresentation. Apple Auto knew or should have known that the Vehicle had prior damage and was poorly repaired, because the damage was evident to any automotive professional. Apple Auto committed fraud or material misrepresentations in the transaction by failing to disclose the structural damage and falsely representing that the

---

[22] (Internal quotation marks omitted.) *Nassar v. Wiz Leasing, Inc.*, No. NNHCV126033894S, 2013 WL 4734851, at *4 (Conn. Super. Ct. Aug. 12, 2013).
[23] *Conte v. Dwan Lincoln-Mercury, Inc.*, 172 Conn. 112, 120 (1976).
[24] *Id.*

frame/chassis passed inspection and was safe. Its fraudulent statements or material misrepresentations were tortious in nature and were made in bad faith, were wanton and malicious, outrageous, and were undertaken with bad motive and with a reckless indifference to Plaintiff's interests and the injury that he sustained. Pursuant to Conn. Gen. Stat. § 42a-2-721, Plaintiff has the same rights for fraud or material misrepresentation as he would have for breach of warranty.

Plaintiff seeks a return of the $2,000 that he paid under the Contract and an order stating that the Contract is cancelled. Plaintiff also seeks as consequential damages reimbursement for the $650 cost of inspection.

This transaction was subject to the Magnuson Moss Warranty Act. Therefore, Apple Auto is also liable to Plaintiff for attorney's fees and costs pursuant to the MMWA, 15 U.S.C. § 2310(d)(2). The MMWA does not create an additional basis for liability, but allows a consumer to recover damages under existing state law and attorney's fees.[25]

### C. CUTPA

#### 1. CUTPA Liability Under Cigarette Rule Analysis

Connecticut courts use the "cigarette test"[26] in determining whether a trade practice is unfair under CUTPA:

It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is

---

[25] *Diaz v. Paragon Motors of Woodside, Inc.*, 424 F.Supp.2d 519, 540 E.D.N.Y.2006), *citing Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (D.C . Cir.1986)
[26] *See FTC v. Sperry & Hutchinson Co.,* 405 U.S. 233 (1972).

immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons].... All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.... Thus a violation of CUTPA may be established by showing either an actual deceptive practice ... or a practice amounting to a violation of public policy.... In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a [prohibited] method, act or practice....[27]

Apple Auto's statutory violations of TILA invoke the "public policy" prong of an unfair trade practice.

The Connecticut Supreme Court held in *Cheshire Mortg. Service, Inc. v. Montes*[28] that a TILA violation may also constitute a CUTPA violation if the consumer can show substantial injury, generally in the form of a monetary loss.[29] More succinctly, the TILA violation must rise above a disclosure violation. In this case, the false down payment resulted in a higher sales tax, and there was an actual monetary loss.

## 2. CUTPA Liability Pursuant to Conn. Agency Reg. § 42-110b-28(b)(1).

It is a *per se* violation of CUTPA to sell a vehicle for more than the advertised price.[30] Apple Auto advertised the Vehicle on its website for $11,495, but it sold the Vehicle for a stated cash price of $12,650. As shown above, the actual price of the Vehicle once the bogus $500 down payment is deducted was $12,150 – an amount that was still $655 more than the advertised price. Car dealerships violate CUTPA by selling

---

[27] *Ulbrich v. Groth*, 310 Conn. 375, 409–10, 78 A.3d 76, 100 (2013)
[28] 223 Conn. 80, 114 (1992)
[29] *Id.,* 113. *See also James v. Lopez Motors, LLC,* No. 3:16-CV-835 (VLB), 2018 WL 1582552, at *6 (D. Conn. 2018).
[30] Conn. Agency Reg. § 42-110b-28(b)(1)

vehicles for more than the price at which they had advertised the vehicle, even if the consumer had not seen the advertisement.[31]

### 3. CUTPA Liability Pursuant to Conn. Agency Reg. § 42-110b-28(b)(23).

Additional CUTPA liability exists under Conn. Agency Reg. § 42-110b-28(b)(23), which provides that any violations of state or federal statutes or regulations regarding the sale of motor vehicles constitute *per se* violations of CUTPA.[32] Apple Auto's failure to perform a safety inspection on the Vehicle violated Conn. Gen. Stat. § 14-62(g). Or, if it did perform a safety inspection, it sold the Vehicle notwithstanding the defects such an inspection would have revealed, and it violated the statute by failing to disclose the Vehicle's defects on the K-208 form.[33]  A violation of § 14-62(g) is a *per se* violation by operation of § 42-110b-28(b)(23).

Courts have also recognized that TILA violations may serve as the basis for *per se* violations under § 42-110-28(b)(23): "Because the court in this case found that Atlantic violated TILA and RISFA, the court finds there is sufficient evidence that Atlantic

---

[31]  *Konikowski v. Stephen Cadillac GMC,* Inc. 2017 WL 048666, *4.  See also *Emmanuelli v. Merriam Motors, Inc.*, No. X04CV020126869S, 2003 WL 22080496, at *2 (Conn. Super Ct. Aug. 25, 2003)(holding that new car sticker placed on vehicle by manufacturer was not advertisement by dealer for purposes of regulation but that selling car for more than that price could violate public policy). .

[32] "Section 42-110b-28(b)(23) of the Regulations of Connecticut State Agencies provides: 'It shall be an unfair or deceptive act or practice for a new car dealer or a used car dealer to violate any provision of a federal or state statute or regulation concerning the sale or lease of motor vehicles.'" *O'Neill v. Country Motors, II, Inc.*, No. 3:15-CV-1069 (CSH), 2015 WL 8779594, at *9, n. 13 (2015).

[33] *Liebman v. Better Way Wholesale Autos, Inc.*, 243 F. Supp. 3d 208, 215 (D. Conn. 2017), vacated on other grounds (June 29, 2017), appeal dismissed sub nom. *Liebman v. A Better Way Wholesale Autos, Inc.*, No. 17-1110, 2017 WL 4679426.

engaged in unfair and deceptive acts in commerce or trade in connection with this

transaction in violation of CUTPA."[34] The *Tirado* court reasoned:

> § 42-110b-28(b)(23) of the Regulations of Connecticut State Agencies provides:
> "It shall be an unfair or deceptive act or practice for a new car dealer or a used
> car dealer to violate any provision of a federal or state statute or regulation
> concerning the sale or lease of motor vehicles." "The Connecticut Supreme Court
> has held ... that violations of the Federal Truth in Lending Act and of General
> Statutes § 36-224l (limiting charges on secondary mortgage loans) are unfair
> trade practices in violation of CUTPA ... A plaintiff who can establish a violation of
> either of these statutes does not need to allege or prove a violation of CUTPA in
> order to obtain substantive relief. If the plaintiff's lawyer is worth her salt,
> however, the complaint will additionally allege a CUTPA violation, because
> General Statutes § 42-110g(d) allows the court to award reasonable attorneys
> fees to the successful plaintiff."[35]

*Tirado* bears close similarity to the instant matter in that Ms. Tirado's claims also

involved a financing agreement with improper disclosures. In the instant matter, the

false down payment resulted in an additional improperly disclosed finance charge in the

form of increased sales tax incidental to credit.

### 4.  CUTPA Damages/Ascertainable Loss

As a result of Apple Auto's conduct, Plaintiff has suffered ascertainable losses of

money or property in that he was sold a defective and unsafe Vehicle, and he incurred

an additional finance charge in the form of increased sales tax. He was also charged

more than the advertised price.

---

[34] (Footnote omitted.) *Tirado v. Ofstein*, No. HHDCV054014648S, 2008 WL 902506, at *16 (Conn. Super.
Ct. 2008)
[35] *Id.*, at *15 *citing Pechiney Corp. v. Crystal,* 43 Conn. Supp. 91, 99-100, 643 A.2d 319 (1994) [10 Conn.
L. Rptr. 606]*, overruled in part on other grounds by Jade Aircraft Sales v. Crystal,* 236 Conn. 701, 674
A.2d 834 (1996).

For Apple Auto's violations of CUTPA, Plaintiff is entitled to his actual damages plus punitive damages and a reasonable attorney's fee.[36] Additionally, Plaintiff is entitled to equitable relief in the form of an order cancelling of the Contract. Therefore, Plaintiff's damages are comprised of the down payment of $1,500[37] and the cost of inspection of $650. These damages total $2,150. This recovery is available under CUTPA or for breach of the implied warranty of merchantability.

### 5. Punitive Damages

"[T]he plaintiff who establishes CUTPA liability has access to a remedy far more comprehensive than the simple damages recoverable under common law... [including] punitive damages and attorney's fees. Section 42–110g does not specify how punitive damages are to be measured; however, the award should serve the broad remedial goals of eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices."[38]

Connecticut courts have recognized the deterrent aim of punitive damages by employing a relatively large multiplier in situations where the actual damages are comparatively small. In *Larobina v. Home Depot USA, Inc.*,[39] the appellate court upheld a 10x multiplier when compensatory damages were only $100 on the theory that "CUTPA is aimed at eliminating or discouraging unfair methods of competition and unfair or deceptive acts or practices. To achieve that result, CUTPA seeks to create a climate in which private litigants help to enforce the ban on unfair or deceptive trade

---

[36] Conn. Gen. Stat. §42-110g(d).
[37] Plaintiff revoked acceptance before his first payment was due under the Contract.
[38] (Internal citations and quotation marks omitted.) *Societa Bario E. Derivati v. Kaystone Chem., Inc.*, No. 5:90-CV-599 (EBB), 1998 WL 182563, at *10 (D.Conn. 1998).
[39] 76 Conn.App. 586 (2003).

practices or acts. Encouraging claimants to walk away from unfair or deceptive practices does not serve to help enforce the ban on unfair trade practices and prevents CUTPA from achieving the remedial effect which the legislature desired."[40]

This approach has been similarly recognized in *Bridgeport Harbour Place I, LLC v. Ganim*, 131 Conn. App. 99, 149 (2011) (6x multiplier); *Benham v. Wallingford Auto Park, Inc.*, No. CV020459418S, 2003 WL 22905163, at *5 (7x multiplier); *Odell v. Wallingford Mun. Fed. Credit Union*, No. CV106012228S, 2013 WL 4734783, at *45 (3x punitive damages under CUPTA on top of 3x civil theft multiplier); *All Am. Custom Pools & Spas v. Schwindeman,* No. FSTCV044001335S, 2007 WL 866238, at *6. (Conn. Super. Ct. March 9, 2007) ($1 compensatory damages and $25,000 punitive damages).

Apple Auto's conduct in this case rises to a level that warrants an award of punitive damages to Plaintiff. Apple Auto sold Plaintiff an unsafe Vehicle and failed even to return his calls when he attempted to have the dealership repair his Vehicle. However, the wrongful conduct also included charging him more than the advertised price for the Vehicle and misrepresenting his down payment. Punitive damages of $10,000, which is approximately 5x actual damages, would have a deterrent effect against others engaging in similar future conduct.

### D.  Assignee Liability of Westlake

Westlake has previously argued that it is not liable as the assignee, because it reassigned the Contract back to Apple Auto on around October 13, 2017. That argument is without merit for the reasons discussed below.

---

[40] *Id.* at 596.

There several related but distinct bases for Westlake's liability as assignee: Conn. Gen. Stat. § 52-572g, the FTC Holder Rule, the express terms of the contract, and Conn. Gen. Stat. § 42-150bb. Section 52-572g(a) provides that

> Any holder in due course of a promissory note, contract or other instrument … evidencing an indebtedness, signed or executed by a buyer in connection with a credit transaction covering consumer goods, as defined in section 42a-9-102… **shall be subject to all of the claims and defenses which the buyer has against the seller arising out of the transaction** or against the person or persons providing the services, limited to the amount of indebtedness then outstanding in connection with the credit transaction, provided the buyer shall have made a prior written demand on the seller with respect to the transaction.[41]

[Emphasis supplied]. The FTC Holder Rule[42] requires that the following terms be included in consumer credit transactions:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

As such, in addition to the Holder Rule, the above block-quoted text is an express term of the Contract. *See* Exhibit C to Plaintiff's Affidavit.

The insertion of the above-quoted contractual language regarding the assignee is required by the FTC regulation, and its inclusion in the contract establishes the language as a contractual term. Indeed, it is an unfair or deceptive trade practice under the FTC Act[43] to fail to include this term.[44] This term has the effect of shifting the risk of

---

[41] While it does not appear to be in dispute, Claimants made written demand on Apple Auto and Westlake August 29, 2017. See Exhibit E to Plaintiff's Affidavit.
[42] 16 C.F.R. § 433.
[43] 15 U.S.C. § 41.
[44] 16 C.F.R. § 433.2.

seller malfeasance or breach from the buyer to the creditor. The FTC has explained the reason for this shifting as follows:

> We have reached a determination that it constitutes an unfair and deceptive practice to use contractual boilerplate to separate a buyer's duty to pay from a seller's duty to perform. We are persuaded that this bifurcation of duties with its attendant externalization of costs injures both consumers and the market. We know of no substantial benefits which may be received by consumers in return for the valuable legal rights they are compelled to relinquish. We can imagine no reasonable measure of value which could justify requiring consumers to assume all risk of seller misconduct, particularly where creditors who profit from consumer sales have access to superior information combined with the means and capacity to deal with seller misconduct cost- expeditiously and economically.[45]

Thus, the FTC concluded that creditors with ongoing contractual relationships with a seller are in a better position than consumers to assess the financial wherewithal and business practices of the retail seller. And, since creditors such as Westlake profit from such relationships, the clause puts the burden – and risk of loss – on the creditor.

In 2012, the FTC clarified that the Holder Rule should be interpreted as broadly as possible in the interests of consumers:

> The Commission affirms that the [Holder] Rule is unambiguous, and its plain language should be applied. No additional limitations on a consumer's right to an affirmative recovery should be read into the Rule, especially since a consumer would not have notice of those limitations because they are not included in the credit contract. Had the Commission meant to limit recovery to claims subject to rescission or similar remedy, it would have said so in the text of the Rule and drafted the contractual provision accordingly. It remains the Commission's intent that the plain language of the Rule be applied, which many courts have done.

> The purpose of the Holder Rule, as stated in the Rule's Statement of Basis and Purpose ("SBP"), supports this plain reading. The Commission adopted the Rule to provide recourse to consumers who otherwise would be legally obligated to make full payment to a creditor despite breach of warranty, misrepresentation, or even fraud on the part of the seller. The Commission found that "the creditor is always in a better position than the buyer to return seller misconduct costs to

---

[45] 40 Fed. Reg. 53,525.

sellers, the guilty party," and therefore concluded that "[s]ellers and creditors will be responsible for seller misconduct."[46]

The policy behind holding assignees liable as if they were the original seller was "to cure business practices that 'separated the buyer's duty to pay for goods or services from the seller's reciprocal duty to perform as promised ... [and where] [c]reditors dunned consumers and collected debts despite the consumers' claims and defenses against the sellers."[47]. Essentially, assignee liability in consumer contracts seeks to prevent an assignee of an account from benefitting when the seller violated the law in the course of the transaction.

> [T]he purpose of the Rule is to reallocate the costs of seller misconduct in the consumer market, "compel [ling] creditors to either absorb seller misconduct costs or return them to sellers ...." . . . The [FTC's] Statement [regarding the Holder Rule] also expressly notes the need for consumer actions against assignees because "the worst sellers are likely to be the most volatile entities where market tenure is concerned. They prove difficult to locate and serve, and the marginal liquidity which characterizes their operations makes collection of a judgment difficult or impossible even if they are successfully served." As a result of this history, as the Statement expressly observes, the FTC intended to shift the risk of seller misconduct from the consumer to the seller and assignees.[48]

Courts have even held that failure to acknowledge liability under the Holder Rule is an unfair trade practice.[49] Beyond that, courts have held, in reliance upon the FTC's

---

[46] Federal Trade Commission Letter to Jonathan Sheldon and Carolyn Carter, 16 C.F.R. Part 433 (May 3, 2012) (Emphasis supplied and footnotes omitted.)

[47] Diaz v. Paragon Motors of Woodside, Inc., 424 F. Supp. 2d 519, 544 (E.D.N.Y. 2006) (Internal citation omitted.); see also Dees v. Bob O'Connor Ford, Inc., No. 94 C 7083, 1995 WL 441629, at *3 (N.D. Ill July 20, 1995)

[48] Lozada v. Dale Baker Oldsmobile, Inc., 91 F. Supp. 2d 1087, 1095–96 (W.D. Mich. 2000) (Citations omitted.

[49] See Jaramillo v. Gonzales, 50 P.3d 554, 562 (N.M. Ct. App. 2002) ("[W]e therefore hold that the Bank's refusal to acknowledge its liability under the FTC Holder Rule was tantamount to an incorrect and misleading assertion that no claims could be brought against it and therefore was a violation of the Unfair Practices Act…")

comments on the Holder Rule that its offensive usage is in place for situations when recovery is impossible against the original seller.[50]

Thus, holders of credit contracts are liable for affirmative claims held by consumers. And, neither § 52-572g nor the FTC Holder Rule condition such liability upon a defendant presently holding the contract. Indeed, both state that "any holder" is subject to the claims and defenses that a debtor could assert against the seller. This language contemplates that there may be multiple holders, each of which may be liable for seller misconduct.

Consequently, courts have held that holders remain liable even following an assignment. In *Duran v. Quantum Auto Sales, Inc.,* a recent California intermediate appellate court decision, the court reasoned under the Holder Rule that a holder's assignment of a contract does not erase its liability thereunder:

> We determined in *Duran I* that Veros could not avoid all liability by assigning the note before the judgment was entered. The notice provided "*any* holder" was subject to all claims and defenses the consumer had against the original seller. We determined a holder who acquires a finance agreement from the seller may be liable to the consumer for the return of all money it received under the contract. "The FTC Holder Rule seeks to place the burden on the seller and its assignee." [51]

This holding is consistent with prior decisions in which courts similarly found that holders remained liable notwithstanding the assignment of the accounts.[52] It is

---

[50] See e.g., Eachen v. Scott Hous. Sys., Inc., 630 F. Supp. 162, 164–65 (M.D. Ala. 1986) citing 40 Fed.Reg. 53527 (1975).

[51] 2017 WL 6334220, at *2 (2017 Cal.App. 4 Dist.), reh'g denied (Jan. 4, 2018) citing Szwak, The FTC "Holder" Rule (2006) 60 Consumer Fin. L.Q. Rep. 361

[52] n re Barker, 306 B.R. 339, 350-351 (Bankr. E.D. Cal. 2004) (assignor's repurchase of debt does not relieve assignee of liability); Associates Home Equity Services, Inc. v. Troup, 778 A.2d 529, 542 (N.J. Super. Ct. App. Div. 2001) ("The clear and unambiguous language of the Rule 'notifies all potential holders that, if they accept an assignment of the contract, they will be "stepping into the seller's shoes."); accord Citifinancial Mortg. Co., Inc. v. Freeman, No. F-3151-04, 2006 WL 1029321, at *4 (N.J. Super Apr. 13, 2006); accord also Mitchell v. Church, No. CIV.A. 04L-10-042, 2006 WL 2194738, at *1 (Del. Super. Jul. 31, 2006). See also Resolution Tr. Corp. v. Cook, 840 S.W.2d 42, 49 (Tex. App. 1992) (if potential

therefore is of no consequence that Westlake reassigned the contract after Plaintiff asserted his claims against it.

Claimant made prior written demand for his claims upon Apple Auto, thereby triggering Westlake's assignee liability under Conn. Gen. Stat. § 52-572g. Liability under that statute is "limited to the amount of indebtedness then outstanding in connection with the credit transaction". The amount financed under the Contract was $12,206.82. This amount was never reduced, because Plaintiff made no payments. Interest of 17.59% ran on this amount from July 20, 2017 through the date of the written demand, or August 29, 2017. This amounts to $235.31. [53] The total amount that was due on that date was therefore $12,442.13. Westlake's liability under Conn. Gen. Stat. § 52-572g is consequently capped at $12,442.13.

Westlake is also liable under the Contract's incorporation of the FTC Holder language, which has a different cap upon liability, i.e., the amount paid by the consumer under the contract. In this case, Plaintiff paid $2,000.  Westlake's total liability is therefore $14,442.13.

This liability cap is in excess of Plaintiff's actual damages claims of $2,650 plus the $10,000 suggested amount for punitive damages. However, the attorney's fee claim, as discussed below, will bring the total amount claimed in excess of that cap.

---

holder "accept[s] assignment of the contract, they will become subject to any claims or defenses the debtor can assert against the seller.").
[53] Per diem of $5.8827 x 40 days.

### E.  Attorney's Fees

Plaintiff is entitled to an award of a reasonable attorney's fee and costs under TILA, MMWA and CUTPA.

Consumers are to be awarded attorney fees in "any successful action" under TILA.[54]  The award is mandatory.[55] Because the federal and state governments lack the resources to adequately police the marketplace and to protect consumers, federal and state consumer protection laws depend upon the private enforcement by aggrieved consumers. The ability of consumers to bring such cases depends upon the availability of private attorneys willing to bring these cases against well-heeled businesses. Accordingly, TILA provides that successful litigants are entitled to recover a reasonable attorney's fee based upon the work performed in the case. The availability of such fees enables private attorneys to handle cases that involve small dollar amounts but which raise complex legal issues.

Plaintiff's claim for the breach of the implied warranty of merchantability was brought pursuant to MMWA, 15 U.S.C. § 2310(d)(1). Section 2310(d)(2) provides that:

> If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such an award of attorneys' fees would be inappropriate.

---

[54] 15 U.S.C. § 1640(a)(3).
[55] *Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 415 n.5, 98 S.Ct. 694, 54 L.Ed. 2d 648 (1978)(Title VII).

Thus, Magnuson-Moss provides that a Plaintiff may recover costs and expenses, including attorney's fees based upon the attorney time actually expended.

Plaintiff is also entitled to fees under CUTPA.  Conn. Gen. Stat. §42-110g(d) provides: "in any action brought by a person under this section, the court may award, to the Claimant, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery." The Connecticut Supreme Court has held that a Plaintiff who establishes a CUTPA claim is entitled to attorney's fees.[56]  Specifically, the Court stated, "Since CUTPA expressly permits the court to award 'costs and reasonable attorney's fee based on the work reasonably performed by an attorney'; *General Statutes* § 42-110g (d); the [parties claiming CUTPA violations] are clearly entitled to such fees.[57]

The award of attorney's fees is an extremely important component in promoting private enforcement of the CUTPA:

> The policy behind CUTPA, namely, to encourage litigants to act as private attorneys general and to bring actions for unfair or deceptive trade practices, is furthered by our conclusion. Integral to effecting this policy, and reflected in the 1976 amendment, is the desire to encourage attorneys to accept and litigate CUTPA cases. CUTPA cases, however, may entail long hours with little likelihood of an award that will cover reasonable expenses. For this reason, General Statutes § 42-110g (d) offers an attorney who accepts a CUTPA case the prospect of recovering reasonable fees and costs.[58]

---

[56] *Barco Auto Leasing Corp. v. House*, 202 Conn. at 120.
[57] *Id. See also* ROBERT M. LANGER ET AL., CONNECTICUT UNFAIR TRADE PRACTICES (2003).
[58] *See Gill v. Petrazzuoli Bros., Inc.*, 10 Conn. App. 22, 33 App. Ct. 1987).  *See also Fabri v. United Techs. Int'l, Inc.*, 193 F. Supp. 2d 480, 486 (D. Conn. 2002), where not awarding attorney's fees, "would be contrary to the purpose of the fee-shifting statute, to encourage the prosecution of meritorious claims

Denying attorney's fees would have a chilling effect and would be contrary to the purpose of the fee-shifting statute.

In *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,*[59] the Second Circuit clarified the proper analysis for a district court to undertake in exercising its considerable discretion in awarding attorney's fees. A court is to

> consider, in setting the reasonable hourly rate it uses to calculate the "lodestar," what a reasonable, paying client would be willing to pay…
>
> [I]n determining what a reasonable, paying client would be willing to pay, consider factors including, but not limited to, the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted *pro bono* (such that a client might be aware that the attorney expected low or non-existent remuneration), and other returns (such as reputation, etc.) that an attorney might expect from the representation.[60]

Essentially, the Second Circuit directs district courts to consider a panoply of factors when considering a fee request:

> The meaning of the term "lodestar" has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness. This opinion abandons its use.[61] We think the better course—and the one most consistent with attorney's fees jurisprudence—is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case-specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay. In determining what rate a paying client would be willing to pay, the district court should consider, among others, the

---

for violation of the substantive provisions of CUTPA."; and *Hinchliffe v. Am. Motors Corp.*, 184 Conn. 607, 617, (1981), where recovery of attorneys' fees, "serves to encourage private CUTPA litigation."
[59] 522 F.3d 182 (2d Cir. N.Y. 2008)
[60] *Id.* at 184.
[61] "While we do not purport to require future panels of this court to abandon the term—it is too well entrenched—this panel believes that it is a term whose time has come." (Footnote in original, numbering modified herein.)

Johnson[62] factors; it should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case.[63]

*Arbor Hill* was a case brought under the Voting Rights Act[64] and involved private local counsel from Albany, New York, a national voting-rights legal non-profit and an experienced, out-of-district firm known for its "muscle" and Second Circuit Appellate work.[65] The thrust of the matter was that the out-of-district firm sought to recoup its fees when billing at its Southern District of New York-level when litigating a case in the Northern District of New York, where the market rate for fees was lower. This district-based analysis of a reasonable fee is called the "forum rule". The Second Circuit in *Arbor Hill* directed courts in this circuit that rather than a mechanistic application of a reasonable rate as determined by the forum rule multiplied the number of hours worked using the lodestar calculation was too limiting of a formula, courts should examine *all* case specific factors, including the *Johnson* factors, in determining the amount of a fee award.[66] The decision urges a philosophical shift from "lodestar" to the "presumptively reasonable fee."[67]

---

[62] The twelve Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.1974)

[63] *Arbor Hill*, supra at 190.

[64] The Second Circuit's analysis focused on the reputational benefit to counsel, as they accepted the case pro bono at the onset. That factor is inapplicable herein.

[65] *Id.*, at 185.

[66] *Id.,* at 184-185.

[67] *Id.,* at 184.

25

The accompanying Declaration of Daniel S. Blinn provides a general description of the work performed, the time expended and the hourly rates.  Plaintiff seeks a reasonable fee of $18,000. The fees are based upon hourly rates of $400 for Daniel S. Blinn, $275 for his associate, Brendan L. Mahoney, $150 for paralegal, Lori Miner, and $95 for legal assistant Dora Fernandez. The request incorporates a voluntary reduction of approximately 10% from the total value of the time due to inefficiencies and duplication of work.

Attorney Blinn has practiced law for more than 30 years, and he has focused his practice on consumer protection matters for more than 20 years.  He has handled more than 1,200 cases involving car dealerships during that time.  He is a former and the current chair of the Consumer Law Section of the Connecticut Bar.  Attorney Blinn has served on the national board of directors of the National Association of Consumer Advocates ("NACA"), and he served for five years as the Treasurer of that organization. He has also served as the chair of NACA's Connecticut chapter for more than eight years. He is also a regular presenter at conferences run by NACA, the National Consumer Law Center, and the Connecticut Bar Association.  In ruling on another attorney's fee application, United States Magistrate Judge Thomas P. Smith referred to him as one of the two "preeminent consumer law attorneys", practicing in the District of Connecticut.[68] The other attorney referenced by Judge Smith was Joanne Faulkner.

The claimed hourly rate of $400/hour has been approved in multiple decisions by federal and state court judges.  Consequently, the undersigned's hourly rates and the

---

[68] *See Negron v. Mallon Chevrolet*, Order on Plaintiff's Motion for Attorney's Fees, September 24, 2012, No. 3:08-cv-00182-TPS, 2012 WL 4358634 (D. Conn. 2012).

rates of his staff have been approved in numerous court decisions, many of which have involved claims against auto dealers.  E.g., *Bristol v. Lake Pocotopaug Auto*, LLC, No. 3:13cv911JBA (D. Conn. Jun. 27, 2014) (found the hourly rates and hours claimed to be reasonably billed by a "well respected consumer attorney and firm"); *Smith v. A Better Way Wholesale Autos, Inc.*, No. 3:15-cv-599AWT (D. Conn. Oct. 26, 2017) ("The court concludes that the time expended was reasonable and that the hourly rates requested are also reasonable."); *Franco v. A Better Way Wholesale Autos, Inc.*, No. 3:14cv422VLB (D. Conn. May 31, 2016); *Dixon v. A Better Way Wholesale Autos, Inc.,* No. 3:15-cv-691AWT (D. Conn. Oct. 27, 2017); *Linsley v. FMS Investment Corp.*, No. 3:11cv00961VLB (D. Conn. June 2, 2014); *Wise v. Cavalry Portfolio Services, LLC*, No. 3:09-cv-00086CSH (D. Conn. Sept. 23, 2013).

Additionally, in 2011, United States Magistrate Judge Holly Fitzsimmons surveyed recent cases, noting that many approved hourly rates of $400/hr and more for comparably experienced attorneys, and Judge Fitzsimmons approved rates of $485/hr and $400/hr for attorneys in that case.[69]

Attorney Brendan Mahoney has been admitted to the practice of law for four years (admitted December 2014) and has no disciplinary record. He is a member of the consumer law section of the Connecticut Bar Association and a member of the National Association of Consumer Advocates. His claimed hourly rate of $275 is well within the

---

[69] *Valley Housing Ltd Partnership v. City of Derby*, 802 F.Supp.2d 359 (D. Conn. 2011).

standards for lawyers of his experience and has been approved in the District of

Connecticut.[70]


### F.  DAMAGES SUMMARY

Actual damages (Breach of Warranty, CUTPA)

|  |  |
|---|---|
| Down payment: | $1,500 |
| Vehicle Inspection | $650 |
| Total: | $2,150 |

Statutory damages

TILA:                                                                                          $2,000[71]

Punitive Damages                                                                   $10,000

Attorney's Fees:                                                                     $18,000


Total:                                                                                     $32,150[72]

---

[70] *See Order on Plaintiff's Motion for Attorney's Fees, Panfili v. Rides By Ryan,  LLC,* 3:17-cv-00290-SRU (D. Conn. July 16, 2018).
[71] Sought against Apple Auto only.
[72] Capped at $14,442.13 with respect to Westlake

### G. CONCLUSION

In light of the foregoing, judgment should enter against Apple Auto in the amount of $32,150 and against Westlake in the amount of $14,442.13. Plaintiff also seeks an order stating that he validly revoked acceptance of the vehicle and has no further liability under the Contract.

PLAINTIFF, ISAAC HERNANDEZ

By: *Daniel S. Blinn*
    Daniel S. Blinn (ct02188)
    Brendan L. Mahoney (ct29839)
    Consumer Law Group, LLC
    35 Cold Spring Road, Suite 512
    Rocky Hill, CT  06067
    (860) 571-0408
    Fax: (860) 571-7457
    dblinn@consumerlawgroup.com
    bmahoney@consumerlawgroup.com

<u>CERTIFICATION</u>

I hereby certify that on September 6, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Daniel S Blinn*
Daniel S Blinn