### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| ISAAC HERNANDEZ,<br>    *Plaintiff*,<br><br>    v.<br><br>APPLE AUTO WHOLESALERS OF<br>WATERBURY LLC & WESTLAKE<br>SERVICES, LLC d/b/a WESTLAKE<br>FINANCIAL SERVICES<br>    *Defendants.* | No. 3:17-cv-1857 (VAB) |

### RULING AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR DEFAULT JUDGMENT

Isaac Hernandez ("Plaintiff") bought a car from Apple Auto Wholesalers of Waterbury LLC ("Apple Auto") in July 2017 and financed it through an installment contract. Apple Auto assigned the installment contract to Westlake Services, LLC, doing business as Westlake Financial Services ("Westlake").

Mr. Hernandez has now sued both Apple Auto and Westlake under federal and state law and is seeking actual and punitive damages as well as attorney's fees and costs.

Mr. Hernandez has filed a motion for default judgment against Apple Auto, following a default entry entered against Apple Auto for failure to defend against Mr. Hernandez's claims.

Mr. Hernandez and Westlake have each moved for summary judgment against the other.

This Ruling and Order will only address Mr. Hernandez's claims and motion against Apple Auto. The Court will address issues relating to Westlake in a separate order certifying questions to the Connecticut Supreme Court.

For the following reasons, Mr. Hernandez's motion for default judgment against Apple Auto is **GRANTED**. Because the Court is certifying questions to the Connecticut Supreme Court

in a separate order related to the claims against Westlake, Mr. Hernandez's motion for summary judgment and Westlake's motion for summary judgment are both **DENIED** without prejudice.

Because Mr. Hernandez validly revoked acceptance of the Vehicle, the Court orders that the installment contract be cancelled and awards actual damages in the amount of $1,500, incidental damages in the amount of $650, statutory damages under TILA in the amount of $2,000, attorney's fees and costs in the amount of $18,000, and punitive damages in the amount of $2,150. In sum, Mr. Hernandez is awarded $24,300 against Apple Auto.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[1]

In July of 2017, Mr. Hernandez agreed to purchase a 2011 Ford Taurus (the "Vehicle") for personal use from Apple Auto and made a down payment of $500. Local Rule 56(A)1 Statement ¶ 1–2, ECF No. 86-5 (Sept. 6, 2019) ("Pl.'s SOMF"); Hernandez Aff. ¶¶ 1, 3–4, ECF No. 86-3 at 1 (Aug. 26, 2019). As part of the payment arrangement, Mr. Hernandez traded in a 2003 Volkswagen Jetta, for which Apple Auto gave him a trade-in allowance of $1,000. Pl.'s SOMF ¶ 3; Hernandez Aff. ¶ 3.

On July 20, 2017, Apple Auto presented Mr. Hernandez with a Retail Purchase Order that listed a cash sale price of $12,650 for the Vehicle. Pl.'s SOMF ¶ 4; Hernandez Aff. ¶ 5; Hernandez Aff. Ex. B, ECF No. 86-3 at 12–13 (Retail Purchase Order (July 20, 2017)) ("Purchase Order"). The Purchase Order states that Mr. Hernandez made a cash payment of $1,000. *Id.*

On July 20, 2017, Apple Auto prepared a Retail Installment Contract (the "Contract") for the Ford Taurus that listed a cash price of $13,427.82, which included $777.82 in sales tax, a

---

[1] The factual background is based on the parties' filings and supporting exhibits.

trade-in allowance of $1,000, and a cash payment of $1,000. Pl.'s SOMF ¶ 7; Hernandez Aff. ¶

8; Hernandez Aff. Ex. C, ECF No. 86-3 at 14–18 (Retail Installment Contract (July 20, 2017))

("Contract"). The Contract listed the financed amount as $12,206.82, which included a $4,231.31

finance charge, and payments of $400.93 a month for forty-one months, starting on September 3,

2017. Pl.'s SOMF ¶ 9; Contract. The Contract listed the total amount payable, including the

down payment and installment payments, as $18,438.12. Pl.'s SOMF ¶ 10; Contract.

Apple Auto also provided Mr. Hernandez a vehicle inspection Form K-208, required by

state law,[2] which indicated that the Ford Taurus passed inspection for all items inspected.

Hernandez Aff. Ex. D, ECF No. 86-3 at 20 (Conn. Dep't of Motor Vehicles, *Vehicle Inspection*

*Form* (July 18, 2017)) ("Form K-208"). Apple Auto signed the form on July 18, 2017. *Id.* Mr.

Hernandez signed the form as the buyer but did not indicate the date of his signing. *Id.*

Shortly after Mr. Hernandez purchased the Vehicle, Apple Auto assigned the Contract to

Westlake. Pl.'s SOMF ¶ 12; Hernandez Aff. ¶ 13.

After he purchased the vehicle, Mr. Hernandez discovered an online advertisement by

Apple Auto for the same Ford Taurus and learned that Apple Auto had at some point[3] advertised

the same Ford Taurus online for $11,495. Pl.'s SOMF ¶¶ 1, 4; Hernandez Aff. ¶¶ 2, 5;

Hernandez Aff. Ex. A, ECF No. 86-3 at 5–10 (*Used 2011 Ford Taurus SHO*, Apple Auto

---

[2] The Form K–208 states that "[t]his report shall be used by a CT licensed dealer to comply with [Conn. Gen. Stat. § 14-62(g)] and must be completed in its ENTIRETY. Before offering any used motor vehicle for retail sale, the selling dealer shall complete a comprehensive safety inspection of such vehicle." Form K-208.

[3] Mr. Hernandez alleges that the online ad represents Apple Auto's advertised price for the car "[p]rior to July 17, 2017." Pl.'s SOMF ¶ 1; Hernandez Aff. ¶ 1. The copy of the advertisement appended as Exhibit A, however, does not contain a date for the advertisement. *See* Apple Auto Ad. Instead, it reflects a date of August 9, 2017, when Mr. Hernandez apparently accessed a stored version of the webpage through his Google cache.

Wholesalers, www.appleautoct.com (accessed through user's Google internet cache[4] Aug. 9, 2017)) ("Apple Auto Ad").

"Immediately after taking delivery" of the Vehicle, Mr. Hernandez also "noticed that the Vehicle would shake when being driven and would make noises during braking." Pl.'s SOMF ¶ 14; Hernandez Aff. ¶ 15. He contacted Apple Auto to have the Vehicle serviced and sent text messages to one of Apple Auto's managers, but his calls and text messages were not returned. Pl.'s SOMF ¶¶ 15–16; Hernandez Aff. ¶¶ 16–17.

On or about August 15, 2017, Mr. Hernandez had the Vehicle inspected by Robert Collins, an independent auto body expert and owner of Wreck Check Assessments of Boston, LLC. Pl.'s SOMF ¶¶ 18–19; Hernandez Aff. ¶¶ 19–20; Collins Aff., ECF No. 86-4 at 1–2 (Aug. 29, 2019); Collins Aff. Ex. A, ECF No. 86-4 at 3–27 (Robert Collins, *Vehicle Inspection and Value*, Wreck Check Assessments of Boston, LLC (Aug. 25, 2017)) ("Collins Report"). As part of the inspection, Mr. Collins reviewed the CarFax Vehicle History Report for the Vehicle, which showed that the Vehicle had been in reported accidents on September 12, 2014, and on May 12, 2016, and that it had been sold at auction on April 19, 2017, with a disclosure by the seller of structural damage. Pl.'s SOMF ¶¶ 22–23; Collins Aff. ¶ 9; Collins Aff. Ex. B, ECF No. 86-4 at 28–34 (CARFAX Vehicle History Report (last updated Aug. 9, 2017)) ("CarFax Report").

---

[4] An internet "cache" file is a temporary storage folder "containing copies of previously viewed web pages which have not been updated" in an individual web user's search engine. *In re Whitehall Ave., LLC*, No. 12-21184, 2014 WL 1329354, at *8 (Bankr. D. Conn. Apr. 1, 2014) ("[S]earch engines . . . inter alia, commonly use cached files to expedite searches."); *see also United States v. Ramos*, 685 F.3d 120, 130 (2d Cir. 2012) (describing cache files as "temporary internet" files"); *Google LLC v. At Home Bondholders' Liquidating Tr.*, 722 F. App'x 1044, 1046 (Fed. Cir. 2018) (explaining that when a user visits a webpage, that page and its graphics "are often stored or 'cached' on the user's terminal, or on an intermediary server like a proxy server, for a specified period of time" so that "if the user requests the same page within that time period, the web page and [its graphics] can be loaded directly from the terminal's memory" (internal citations and quotation marks omitted)).

After inspecting the Vehicle and reviewing its CarFax Report, Mr. Collins determined that the vehicle had structural damage and was "not safe to operate on public roads." Collins Report at 1. Specifically, Mr. Collins found that the vehicle had been involved in "an event that caused structural damage to the front and rear of the vehicle," that it was "not in merchantable condition," that it was "unsafe due to structural damage," and that it had "not been restored in a quality and workmanlike manner." Pl.'s SOMF ¶¶ 28–31; Collins Report at 3. He stated that "[a]ny automotive profession[al] performing a simple visual inspection can clearly see that this vehicle has been wrecked and poorly repaired," and that it had been repaired to a "Repair Level 4, which entails the use of only some of the available procedures, parts, and materials to provide the minimum level of repair that would be acceptable to the average consumer's untrained eye." Pl.'s SOMF ¶¶ 32–33; Collins Report at 3.

Based on the asking prices for similar Ford Taurus vehicles with similar damage history, Mr. Collins determined that the fair market value for the Vehicle Mr. Hernandez purchased on July 20, 2017 would have been $11,000. Pl.'s SOMF ¶ 27; Collins Report at 3.

On August 28, 2017, Mr. Hernandez returned the Vehicle to Apple Auto by leaving it in Apple Auto's parking lot. Pl.'s SOMF ¶ 36; Hernandez Aff. ¶ 23; Hernandez Aff. Ex. E, ECF No. 86-3 at 21–24 (Letter from Daniel Blinn to Apple Auto and Westlake re: Isaac Hernandez— 2011 Ford Taurus SHO (Aug. 29, 2017)) ("Demand Letter").

On August 29, 2017, Mr. Hernandez sent a letter through his counsel to Apple Auto and Westlake. Pl.'s SOMF ¶ 37; Hernandez Aff. ¶ 24; Demand Letter. The letter stated that Mr. Hernandez had revoked his acceptance of the Vehicle, that Apple Auto had sold him an unmerchantable and unsafe vehicle and fraudulently misrepresented the state of the vehicle on

the Inspection Form in breach of the implied warranty of merchantability under Article 2 of the Uniform Commercial Code. Demand Letter.

The letter also stated that Apple Auto had violated the Truth in Lending Act (TILA) and the Connecticut Unfair Trade Practices Act (CUTPA) by stating a false down payment of $2,000 "when Mr. Hernandez only provided $500 cash" and a $1,000 trade-in allowance. *Id.* The letter demanded that Apple Auto return his $500 cash down payment and either the 2003 Volkswagen Jetta that Mr. Hernandez traded in or the $1,000 allowance that was agreed upon for the Jetta. The letter also stated that Westlake was "advised that Mr. Hernandez disputes any further indebtedness under the retail installment contract." *Id.* The letter asserted that "Mr. Hernandez also has claims for his attorney's fees under CUTPA, TILA[, and] the federal Magnuson Moss Warranty Act." *Id.* It asserted further that any attempts by Westlake "to contact Mr. Hernandez directly in an attempt to collect th[e] disputed debt would be a violation of the Connecticut Creditor Collection Practices Act." *Id.*

On October 13, 2017, Westlake assigned the Contract back to Apple Auto. Pl.'s SOMF ¶ 39; Pl.'s SOMF Ex. 1, ECF No. 86-5 at 9 (Westlake Financial Services, Reassignment of Contract (Oct. 13, 2017)) ("Contract Reassignment").

Apple Auto never refunded any part of Mr. Hernandez's deposit or the value of his trade in, and Mr. Hernandez never made any installment payments under the Contract. Pl.'s SOMF ¶¶ 38, 40; Hernandez Aff. ¶¶ 25–26.

### B. Procedural History

On November 3, 2017, Mr. Hernandez filed the Complaint alleging that Defendants violated the Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.*; the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*; Article 2 of the Uniform Commercial Code ("UCC"); Conn. Gen.

Stat. §§ 42a-2-101 *et seq.*; and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110 *et seq.* Compl. ¶ 1.

On December 11, 2017, Mr. Hernandez filed a motion for default entry against Apple Auto under Fed. R. Civ. P. 55, for Apple Auto's failure to file a responsive pleading. Mot. for Default Entry, ECF No. 11 (Dec. 11, 2017) ("First Mot. for Default Entry—Apple Auto").

On December 13, 2017, the Court granted Plaintiff's motion for default entry. Order Granting Mot. for Default Entry, ECF No. 12 (Dec. 13, 2017).

On December 14, 2017, two attorneys appeared on behalf of Apple Auto. Notices of Appearance, ECF Nos. 13–14 (Dec. 14, 2017). The next day, Apple Auto filed a motion to set aside default. Mot. to Set Aside Default, ECF No. 15 (Dec. 15, 2017) ("First Mot. to Set Aside Default Entry").

On January 12, 2018, the two attorneys who appeared on behalf of Apple Auto entered appearance on behalf of Westlake as well. Notices of Appearance, ECF Nos. 16–17 (Jan. 12, 2018).

On January 23, 2018, the Court granted Apple Auto's motion to set aside default entry, noting that "Plaintiff indicates he does not oppose vacating the entry of default." Order, ECF No. 21 (Jan. 23, 2018).

On February 2, 2018, Defendants filed a motion to stay litigation so that the parties could move to arbitration. Mot. for Stay of Litig., ECF No. 22 (Feb. 2, 2018). Initially, Plaintiff did not oppose the motion to stay, and he indicated that he had "commenced an arbitration demand with the American Arbitration Association in accordance with the agreement to arbitrate referenced by" Defendants. Pl.'s Resp. to Mot. to Stay Litig., ECF No. 23 (Feb. 14, 2018) ("Pl.'s First Resp. to Mot. to Stay").

On April 25, 2018, however, Plaintiff filed a second response to Defendants' motion to stay, alleging that "on March 9, 2018, the American Arbitration Association ("AAA") issued a letter declining to administer the claim due to Westlake Services' Failure to comply with AAA's policies." Pl.'s Obj. to Mot. to Stay Litig., ECF No. 25 (Apr. 25, 2018) ("Pl.'s Second Resp. to Mot. to Stay"). He attached a letter from the AAA in support of his opposition to the motion to stay. Pl.'s Second Resp. to Mot. to Stay Ex. A, ECF No. 25-1 (Apr. 25, 2018) ("AAA Letter"). The AAA Letter stated further that, "[a]ccording to R-1(d) of the Consumer [Arbitration] Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution." *Id.*

On the same day, Mr. Hernandez filed a motion for default entry under Fed. R. Civ. P. 55(a) against Westlake for failure to file a responsive pleading. Mot. for Default Entry, ECF No. 26 (Apr. 25, 2018) ("Second Mot. for Default Entry—Westlake"). Westlake objected to the motion for default entry on the same day as well. Obj. to Default Entry as to Westlake, ECF No. 29 (Apr. 25, 2018).

Still on the same day, a third attorney entered an appearance on behalf of Defendants. Notice of Appearance, ECF No. 27 (Apr. 25, 2018).

On May 18, 2018, one of Defendants' three attorneys moved to withdraw. Motion to Withdraw, ECF No. 30 (May 18, 2018). The Court granted that motion on May 21, 2018. Order, ECF No. 32 (May 21, 2018).

On June 1, 2018, after a telephonic status conference, the Court entered a scheduling order requiring Defendants to file responsive pleadings to the Complaint by June 15, 2018. Sched. Order, ECF No. 35 (June 1, 2018).

On June 21, 2018, Mr. Hernandez filed another motion for default entry against both Defendants for their failure to file a responsive pleading by the deadline set by the Court of June 15, 2018. Mot. for Default Entry, ECF No. 41 (June 21, 2018) ("Third Mot. for Default Entry—Both Defs.").

On June 25, 2018, the Court granted Plaintiff's motion for default entry against Defendants. Order, ECF No. 43 (June 25, 2018).

On the same day, Defendants filed an Answer with affirmative defenses to the Complaint. Answer, ECF No. 44 (June 25, 2018). While the document was filed as an Answer on behalf of both Defendants, it was signed only by Westlake. *Id.*

On June 25, 2018, Defendants' two remaining attorneys also jointly moved to withdraw as counsel for Defendants, stating that "[t]he attorney-client relationship has deteriorated and is not capable of being restored." Mot. to Withdraw, ECF No. 42 (June 25, 2018). Counsel also filed a motion to vacate default entry, stating that "default should be vacated to provide adequate time for the defendants to retain new counsel to appear and represent them in this matter" and noting that an Answer had now been filed. Mot. to Set Aside Order on Mot. for Default Entry, ECF No. 45 at 2, 4 (June 25, 2018) ("Second Mot. to Set Aside Default Entry").

On August 17, 2018, the Court granted counsel's motion to withdraw and granted the motion to set aside default entry. Orders, ECF Nos. 48–49 (Aug. 17, 2018).

On August 27, 2018, Mr. Hernandez filed another motion for default entry against both Defendants, contending that "[d]espite notice to the defendants that failure to secure successor counsel may result in a default being entered against them, no successor counsel has appeared." Mot. for Default Entry, ECF No. 50 (Aug. 27, 2018) ("Fourth Mot. for Default Entry—Both Defs.").

On October 17, 2018, a new attorney appeared on behalf of Westlake. Notice of Appearance, ECF No. 51 (Oct. 17, 2018). The next day, Westlake filed an objection to Plaintiff's motion for default against it. Obj. to Mot. for Default Entry, ECF No. 52 (Oct. 18, 2018) ("Westlake Obj. to Fourth Mot. for Default Entry").

On October 29, 2018, the Court found as moot Plaintiff's fourth motion for default entry. Order, ECF No. 53 (Oct. 29, 2018).

On November 2, 2018, Mr. Hernandez moved for default entry again, this time only as to Apple Auto, noting that Apple Auto still had not entered an appearance. Mot. for Default Entry, ECF No. 54 (Nov. 2, 2018) ("Fifth Mot. for Default Entry—Apple Auto").

On June 25, 2019, the Court denied Plaintiff's fifth motion for default entry "as Defendant ha[d] appeared and answered." Order, ECF No. 81 (June 25, 2019). Mr. Hernandez moved again for default entry against Apple Auto on July 1, 2019, however, stating that "there is no record of appearance on file for Apple Auto since the withdrawal of its counsel, and a limited liability company cannot appear in court pro se or by an individual who is not an attorney." Mot. for Default Entry, ECF No. 82 (July 1, 2019) ("Sixth Mot. for Default Entry—Apple Auto").

On July 2, 2019, the Court granted Plaintiff's sixth motion for default entry against Apple Auto. Order, ECF No. 83 (July 2, 2019).

On September 6, 2019, Mr. Hernandez filed a motion for default judgment as to Apple Auto, together with a motion for summary judgment against Westlake. Mot. for Default J. as to Apple Auto, ECF No. 86 (Sept. 6, 2019); Mot. for Summ. J. as to Westlake, ECF No. 86-1 (Sept. 6, 2019). In support of these motions, Mr. Hernandez filed a memorandum of law, a statement of material facts, and a declaration by his attorney. Mem. of Law in Supp. of Mot. for Default J. and Mot. for Summ. J., ECF No. 86-2 (Sept. 6, 2019) ("Pl.'s Mem."); Pl.'s SOMF; Blinn Decl., ECF

No. 86-6 (Sept. 6, 2019). He also attached his own affidavit accompanied by five exhibits, Hernandez Aff.; Hernandez Aff. Exs. A–E, ECF No. 86-3 at 5–24; and an affidavit from Robert Collins, an independent auto body expert, along with two exhibits, Collins Aff., Collins Aff. Exs. A–B, ECF No. 86-4 at 3–34.[5]

On November 12, 2019, Westlake filed an opposition to Plaintiff's motion for summary judgment. Def.'s Opp'n to Summ. J., ECF No. 90 (Nov. 12, 2019) ("Westlake Mem."). Westlake attached an affidavit from its Litigation Manager, John Schwartz, Schwartz Aff., ECF No. 90-1 (Oct. 28, 2019); and a California state appellate court decision, *Duran v. Quantum Auto Sales, Inc.*, No. G053712, 2017 WL 6334220 (Cal. Ct. App. Dec. 12, 2017), ECF No. 90-2. Westlake only responded to Mr. Hernandez's claims regarding assignee liability and did not make any argument as to Mr. Hernandez's underlying claims against Apple Auto.

On November 13, 2019, Westlake also moved for summary judgment against Mr. Hernandez, and submitted a memorandum of law identical to its objection to Mr. Hernandez's motion for summary judgment, and the same affidavit and California state appellate decision. *See* Def.'s Cross Mot. for Summ. J., ECF No. 91 (Nov. 13, 2019); Mem. of Law in Supp. of Cross Mot. for Summ. J., ECF No. 91-1 (Nov. 13, 2019); Schwartz Aff., ECF No. 91-2 (Oct. 28, 2019); *Duran*, 2017 WL 6334220, ECF No. 91-3.

On December 4, 2019, Mr. Hernandez filed a reply in support of his motion for summary judgment, which also served as his response to Westlake's cross-motion for summary judgment. Reply and Obj. to Cross Mot. for Summ. J., ECF No. 94 (Dec. 4, 2019) ("Pl.'s Reply").

---

[5] Mr. Hernandez filed his motion for summary judgment against Westlake twice on the same day: once along with the motion for default judgment against Apple Auto, at ECF No. 86, and once as a separate filing, at ECF No. 87. Since the motions and their exhibits are identical, the Court will refer to ECF No. 86 for clarity.

On April 16, 2020, the Court held a telephonic hearing on the cross-motions for summary judgment and the motion for default judgment against Apple Auto. Minute Entry, ECF No. 97 (Apr. 16, 2020).

## II.   STANDARD OF REVIEW

Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment." *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011). Plaintiffs must first obtain an entry of default under Rule 55(a), by showing that the defaulting party "has failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). The second step is to seek a default judgment under Rule 55(b). "Once default has been entered, the allegations of the complaint that establish the defendant's liability are accepted as true, except for those relating to the amount of damages." *Baranowski v. Parker*, No. 3:16-cv-01816 (VAB), 2018 WL 3626321, at *3 (D. Conn. July 30, 2018) (quoting *Coles v. Lieberman, Michaels & Kelly, LLC*, No. 10-cv-484S, 2011 WL 3176467, at *1 (W.D.N.Y. July 27, 2011)).

> Rule 55(b)(1) allows the clerk to enter a default judgment if the plaintiff's claim is for a sum certain and the defendant has failed to appear and is not an infant or incompetent person. In all other cases, Rule 55(b)(2) governs, and it requires a party seeking a judgment by default to apply to the [C]ourt for entry of a default judgment.

*New York v. Green*, 420 F.3d 99, 104 (2d Cir. 2005) (internal citation and quotation marks omitted).

"It is an ancient common law axiom that a defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011). Nevertheless, a district court is still "required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law." *Id.*

"Following such a determination, the district court must also determine the amount of damages to be awarded; to do so, it may conduct a hearing or it may make such a finding on the basis of documentary evidence if damages are ascertainable with reasonable certainty." *Chance v. Karmacharya*, No. 3:14-cv-01111 (JAM), 2017 WL 5515951, at *1 (D. Conn. Mar. 20, 2017) (citing *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)). "A court may not 'just accept [a plaintiff's] statement of the damages,' even in a default judgment." *Id.* at *2 (quoting *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997)).

## III.   DISCUSSION

Mr. Hernandez asserts four claims against Apple Auto: (1) violation of the Truth in Lending Act, Compl. ¶¶ 29–35; (2) breach of the implied warranty of merchantability in violation of Conn. Gen. Stat. § 42a-2-314, *id.* ¶¶ 38–43; (3) revocation of acceptance under Conn. Gen. Stat. § 42a-2-608, *id.* ¶¶ 47–51; and (4) violations of CUTPA, *id.* ¶¶ 53–55.

Mr. Hernandez contends that he is entitled to an order that he validly and effectively revoked his acceptance of the Vehicle under Article 2 of the UCC and Conn. Gen. Stat. § 42a-2-608, that Apple Auto is liable to him for actual and punitive damages, and that Apple Auto is liable for attorney's fees and costs under the Magnuson-Moss Warranty Act and CUTPA. Compl. ¶¶ 35, 44–45, 50–51, 56.

### A.  Truth in Lending Act Claim

The Truth in Lending Act "is a disclosure statute concerned with consumers' "informed use of credit," which "results from an awareness of the cost thereof by consumers." 15 U.S.C. § 1601(c). *Morales v. Barberino Bros., Inc.*, No. 3:15-cv-00301 (CSH), 2016 WL 2626826, at *3 (D. Conn. May 5, 2016). It "reflect[ed] a transition in congressional policy from a philosophy of

'Let the buyer beware' to one of 'Let the seller disclose.'" *Mourning v. Family Pub. Serv., Inc.*, 411 U.S. 356, 377 (1973). Its purpose is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *Id.* The Truth in Lending Act "is a remedial statute, [and] it is interpreted strictly in favor of the consumer." *Frazee v. Seaview Toyota Pontiac, Inc.*, 695 F. Supp. 1406, 1408 (D. Conn. 1988).

Among other things, the Truth in Lending Act

> requires that creditors in consumer credit transactions disclose the identity of the creditor, the amount financed, a statement of the consumer's right to obtain a written itemization of the amount financed, the finance charge, the APR, the total payments and the number, amount, and due dates or period of payments scheduled to repay the total payments.

*James v. Lopez Motors, LLC*, No. 3:16-cv-835 (VLB), 2018 WL 1582552, at *3 (D. Conn. Mar. 31, 2018) (citing 15 U.S.C. § 1638(a)). The "amount financed" is computed by "tak[ing] the principal amount of the loan or the cash price less down payment and trade-in; [] add[ing] any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 1605 of this title; and [] subtract[ing] any charges which are part of the finance charge but which will be paid by the consumer before or at the time of the consummation of the transaction, or have been withheld from the proceeds of the credit." 15 U.S.C. § 1638(a)(2)(A). "[T]he computations need not be disclosed." *Id.*

Mr. Hernandez claims that Apple Auto violated the Truth in Lending Act by including a false down payment of $2,000, consisting of a $1,000 trade-in value and $1,000 cash. Pl.'s Mem. at 7. He argues that, in reality, "only $500 in cash was requested and paid," and that this

"inaccurate itemization of the amount financed is a violation of 15 U.S.C. § 1638(a)(2)(A)." *Id.*
Mr. Hernandez argues that the additional $500 reflected on the purchase order resulted in a false
price listed on the purchase contract of $12,650, instead of $12,150; and he argues that $30.74 of
additional sales tax was charged on this falsely inflated sale price. *Id.*

A seller that inflates the price above another price discussed with a buyer may be in
violation of the Truth in Lending Act. *See, e.g.*, *Llaurador-Perez v. Clean Country Cars, Inc.*,
No. 3:13-cv-1333 (JBA), 2014 WL 5780706, at *4 (D. Conn. Nov. 5, 2014) (finding that
allegations that a car dealership inflated the buyer's down payment in order to increase the
amount financed were sufficient to state a claim under 15 U.S.C. § 1638); *Diaz v. Paragon
Motors of Woodside, Inc.*, 424 F. Supp. 2d 519 (E.D.N.Y. 2006); (finding that "an increase in
price above the advertised price constitute[d] a hidden finance charge because [Plaintiff] was
forced to pay the increase based on his need to secure sub-prime financing")).

However, "[t]he focus of [the Truth in Lending Act] is full disclosure of all terms and
charges." *Morales*, 2016 WL 2626826, at *5 (quoting *Gregory v. Metro Auto Sales, Inc.*, No. 15-
2601, 2016 WL 336861, at *3 (E.D. Pa. Jan. 27, 2016)). "Regardless of whether [p]laintiff was
unfairly taken advantage of in the overall transaction," there is no violation of the Truth in
Lending Act where "[a]ll of the financial terms of the transaction were set forth in full." *Id.* at
**5–6 (noting that the plaintiff had not cited "a single court decision finding that an inflated, but
accurately disclosed, 'amount financed' constituted a violation of TILA § 1638(a)(2)(B)").

Mr. Hernandez has provided an affidavit asserting that only $500 in cash was requested
and paid. Hernandez Aff. ¶¶ 3, 6–8. Although the Purchase Order and Contract in the record
state that he paid $1000 in cash, there is no record evidence that Apple Auto actually received
$1000 from Mr. Hernandez. Purchase Order; Contract.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a); *see Holcombe v. Matsiborchuk*, 747 F. App'x 875, 878 (2d Cir. 2018) (summary order) ("[E]vidence must be authentic, and authenticity is determined by seeing if 'the item is what the proponent claims it is.'" (quoting *United States v. Vayner*, 769 F.3d 125, 129 (2d Cir. 2014)), *cert. denied*, 139 S. Ct. 2639 (2019). Without authentication, the assertion in the Purchase Order and Contract that Mr. Hernandez paid $1000 is inadmissible hearsay. *See* Fed. R. Evid. 801(c) ("'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."); Fed. R. Evid. 803(6) (business records may fall within an exception to the rule against hearsay, but only if certain "conditions are shown by the testimony of the custodian or another qualified witness"); *cf. Johnson & Johnson & Lifescan, Inc. v. S. Pointe Wholesale, Inc.*, No. 08-CV-1297 (SLT) (SMG), 2014 WL 12558573, at *17 n.31 (E.D.N.Y. Apr. 4, 2014) ("The MSI Defendants contend that the invoices referenced in the text should not be considered because they have not been authenticated or established to be business records and are thus inadmissible hearsay. However, in his declaration, Hernandez clearly and unambiguously describes the invoices as true and correct copies of documents created by NDC in the ordinary course of its business at or about the time of the transactions the documents reflect.").

There is no testimony in the record attesting to the truth of the assertion made in the Purchase Order and Contract that Mr. Hernandez paid $1000 in cash. As a result, Apple Auto has not disputed that Mr. Hernandez only paid $500 in cash and thus cannot dispute that the terms of the loan were inflated by Apple Auto.

Accordingly, default judgment on the Truth in Lending Act claim will be granted and, based on the record evidence, actual damages will be awarded as described below. *See Chance*, 2017 WL 5515951, at *1 ("A court may not 'just accept [a plaintiff's] statement of the damages,' even in a default judgment.")

### B.  Breach of Implied Warrant of Merchantability

Under Conn. Gen. Stat. § 42a-2-314, "a warranty that . . . goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Conn. Gen. Stat. § 42a-2-314(1). Goods are "merchantable" if they are, among other things, "fit for the ordinary purposes for which such goods are used." Conn. Gen. Stat. § 42a-2-314(2).

> In order to state a claim for breach of the implied warranty of merchantability, a party must plead that: (1) a merchant sold the goods; (2) the goods were defective and not merchantable at the time of sale; (3) injury occurred to the buyer or his property; (4) the injury was caused by the merchant's defective product; and (5) notice was given to the seller of the claimed breach.

*Gallinari v. Kloth*, 148 F. Supp. 3d 202, 215 (D. Conn. 2015) (internal citations omitted). "The goods are not merchantable when, among other things, they are not fit 'for the ordinary purposes for which such goods are used' and will not pass in the trade without objections." *Phila. Indem. Ins. Co. v. Lennox Indus., Inc.*, No. 3:18-cv-00217 (CSH), 2020 WL 705263, at *8 (D. Conn. Feb. 12, 2020) (quoting Conn. Gen. Stat. § 42a-2-314(2)).

A car dealership is a "merchant" under Conn. Gen. Stat. § 42a-2-314, and a "car's ordinary purpose is 'normal and reliable driving.'" *Alexis v. PMM Enterprises LLC*, No. 3:17-cv-1622 (MPS), 2018 WL 5456491, at *4 (D. Conn. Oct. 29, 2018) (citing *Tirado v. Ofstein*, No. HHD-CV-054014648-S, 2008 WL 902506, at *5 (Conn. Super. Ct. Mar. 14, 2008)).

Mr. Hernandez argues that Apple Auto breached the implied warranty of merchantability under Conn. Gen. Stat. § 42a-2-314 because the Vehicle had "structural damage rendering it

unsafe to drive," and despite Mr. Hernandez contacting Apple Auto to remedy the issues with the Vehicle, Apple Auto failed to respond. Pl.'s Mem. at 9.

The evidence in the record supports Mr. Hernandez's claim that "the goods were defective and not merchantable at the time of sale." *Gallinari*, 148 F. Supp. 3d at 215. Apple Auto completed the Form K-208 two days prior to selling the Vehicle stating that the Vehicle passed inspection. *See* Form K-208. Mr. Hernandez stated in his affidavit, however, that he began noticing issues with the car "[i]mmediately after taking delivery." Hernandez Aff. ¶ 15. Less than a month after purchasing the Vehicle, Mr. Collins, an auto body expert, inspected the car and found that it had structural damage and was "not safe to operate on public roads." Collins Report at 1. Moreover, a CarFax report for the Vehicle showed that the Vehicle had been in reported accidents on September 12, 2014, and on May 12, 2016, and that it had been sold at auction with a disclosure by the seller of structural damage on April 19, 2017. CarFax Report.

The evidence thus shows that the Vehicle had structural damage two months before Apple Auto sold it to Mr. Hernandez. Although it might be conceivable that a used car dealer could have repaired such damage within two months before selling the car to a buyer, the well-pleaded allegations and supporting evidence here do not suggest that Apple Auto did so, where Mr. Hernandez experienced issues immediately after purchasing the car and Mr. Collins found structural damage existed in the Vehicle within a month after its sale. Mr. Collins furthermore found that the car had been repaired just enough "to provide the minimum level of repair that would be acceptable to the average consumer's untrained eye." Collins Report at 3.

Thus, notwithstanding the Form K-208, Mr. Hernandez's well-pleaded allegations, supported by record evidence, establish that the Vehicle had not been in merchantable condition at the time it was sold.

Accordingly, Mr. Hernandez will be granted default judgment on his claim that Apple Auto breached the implied warranty of merchantability. *See Alexis*, 2018 WL 5456491, at *4 (finding on summary judgment that used car buyers had established that a seller breached the implied warranty of merchantability where an independent expert determined shortly after the sale "that the Vehicle had been involved in a prior event that caused structural damage to the rear and left side of the Vehicle, and the Vehicle was improperly repaired and was not in merchantable condition and was unsafe to drive," and "that any automotive professional performing a simple visual inspection could clearly see that the Vehicle had been wrecked and poorly repaired.").

## C. Revocation of Acceptance Claim

Under Conn. Gen. Stat. § 42a-2-608, a buyer may revoke his or her acceptance of goods if "acceptance was reasonably induced either by the difficulty of discovery [of nonconformance] before acceptance or by the seller's assurances." Conn. Gen. Stat. § 42a-2-608(1)(b)). In order to revoke an acceptance of goods, the buyer must notify the seller of his revocation within a reasonable time after the buyer discovers or should have discovered the defect at issue. *See McLeod*, 177 Conn. App. at 431 (citing Conn. Gen. Stat. § 42a-2-608(2)).

To justify revocation under Conn. Gen. Stat. § 42a-2-608, the buyer must prove the following conditions:

> (1) a nonconformity which substantially impairs the value to the buyer;
>
> (2) acceptance (a) with discovery of the defect, if the acceptance is on the reasonable assumption that the nonconformity will be cured, or (b) without discovery of the defect, when the acceptance is reasonably induced by the difficulty of discovery or the seller's assurances;

> (3) revocation within a reasonable time after a nonconformity was discovered or should have been discovered; and
>
> (4) revocation before any substantial change occurs in the condition of the goods which is not caused by their own defects.

*O'Neill v. Country Motors, II, Inc.*, No. 3:15-cv-1069 (CSH), 2015 WL 8779594, at *11 (D. Conn. Dec. 15, 2015) (citing *Conte v. Dwan Lincoln Mercury, Inc.*, 172 Conn. 112, 120–21 (1976)); *see also Llaurador-Perez*, 2014 WL 5780706, at *2 (quoting the same conditions under Conn. Gen. Stat. § 42a-2-608).

"Upon justifiable revocation, a buyer is entitled to the same remedies as if the goods were rejected initially." *Alexis*, 2018 WL 5456491, at *4 (citing Conn. Gen. Stat. § 42a-2-608(3)). "This includes recovery of the amount paid for the goods, Conn. Gen. Stat § 42a-2-711(1), as well as incidental damages, Conn. Gen. Stat. § 42a-2-715(1)." *Id.*

Mr. Hernandez argues that he justifiably revoked acceptance of the Vehicle under Conn. Gen. Stat. § 42a-2-608. Pl.'s Mem. at 10–11. He contends that he is entitled to an order that he revoked acceptance of the Vehicle and that the Contract is cancelled, that he is entitled to recover the amount he paid under the Contract plus reimbursement for the $650 cost of inspection, and that he is entitled to attorney's fees and costs under the MMWA. *Id.* at 11.

Mr. Hernandez revoked his acceptance of the Vehicle by returning it to Apple Auto on August 28, 2017, just over a month after purchasing it and just three days after Mr. Collins issued his report finding that the Vehicle had structural damage. Hernandez Aff. ¶¶ 3, 28; Collins Report. He notified Defendants of his revocation the following day, August 29, 2017. Hernandez Aff. ¶ 24; Demand Letter.

Mr. Hernandez's well-pleaded allegations establish that he justifiably revoked acceptance of the Vehicle under Conn. Gen. Stat. § 42a-2-608. Moreover, Mr. Hernandez has presented

substantial evidence proving that he did so. Mr. Collins's report shows that the Vehicle had
structural damage that decreased the value of the car. *See* Collins Report. As the Court has
explained, Mr. Hernandez was unaware of the damage at the time of his purchase, and he was
"reasonably induced" to purchase the Vehicle based on "the seller's assurances" in the Form K-
208 that the Vehicle was not defective. Thus, Mr. Hernandez's has shown that his revocation of
acceptance was justified.

As a result, the Court will grant Mr. Hernandez default judgment on his revocation of
acceptance claim and declares that Mr. Hernandez justifiably revoked acceptance of the Vehicle
under the Contract.[6] The Contract therefore is cancelled.

## D. Connecticut Unfair Trade Practices Act ("CUTPA") Claims

The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall
engage in . . . unfair or deceptive acts or practices in the conduct of any trade or commerce."
Conn. Gen. Stat. § 42-110b(a). It further provides that "[a]ny person who suffers any
ascertainable loss of money or property, real or personal, as a result of the use or employment of
a method, act or practice prohibited by section 42-110b, may bring an action." Conn. Gen. Stat. §
42-110g(a). A plaintiff must meet two threshold requirements to bring a CUTPA claim. "First
the plaintiff must establish conduct that constitutes an unfair or deceptive trade practice. Second,
the plaintiff must establish a basis for a reasonable estimate of damages." *Chem-Tek, Inc. v. Gen.
Motors Corp.*, 816 F. Supp. 123, 130 (D. Conn. 1993) (citing *A. Secondino & Son, Inc. v.
LoRicco*, 215 Conn. 336 (Conn. 1990)); *see also McNeil v. Yale Univ.*, No. 3:19-cv-00209

---

[6] Mr. Hernandez argues in the alternative that he also is entitled to revocation of acceptance based on fraud or
material misrepresentation, since under Conn. Gen. Stat. § 42a-2-721 plaintiffs have the same rights for fraud or
material misrepresentation as they do for breach of warranty. Pl.'s Mem. at 10–11. But because the Court here finds
that Mr. Hernandez justifiably revoked his acceptance based on breach of implied warranty, and based on Mr.
Hernandez's counsel's clarification during the hearing on April 16, 2020, that Mr. Hernandez does not assert an
independent common law fraud claim, the Court will not reach any question of fraud or misrepresentation.

(VAB), 2020 WL 495061, at *32 (D. Conn. Jan. 30, 2020) (dismissing CUTPA claims for failure to meet threshold requirements); *Bellemare v. Wachovia Mortg. Corp.*, 94 Conn. App. 593, 606 n.6 (2006) ("CUTPA provides a statutory cause of action for any person who has suffered an ascertainable loss of money or property as a result of an unfair trade practice.").

Once these threshold requirements have been met, "[t]o determine whether a business practice violates CUTPA, Connecticut courts follow the Federal Trade Commission's 'cigarette rule[.]'" *Aztec Energy Partners, Inc. v. Sensor Switch, Inc.*, 531 F. Supp. 2d 226, 232 (D. Conn. 2007). The factors weighed under the cigarette rule are

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise— whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other business[persons]).

*Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119–20 (2d Cir. 2004) (internal quotation marks and citation omitted); *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 106 (1992). "All three criteria do not need to be satisfied to support a finding of unfairness." *Cheshire Mortg.*, 223 Conn. at 106 (internal quotation marks and citation omitted).

Under CUTPA implementing regulations, "it is a *per se* violation for a car dealership to fail to comply with a state or federal law concerning the sale of motor [v]ehicles." *Liebman v. Better Way Wholesale Autos, Inc.*, 243 F. Supp. 3d 208, 215 (D. Conn. 2017) (citing Conn. Agency Reg. § 42-110b-28(b)(23)), *vacated on other grounds*, No. 3:15-cv-01263 (JBA), ECF No. 31 (June 29, 2017); *see also O'Neill*, 2015 WL 8779594, at *9 ("'It shall be an unfair or deceptive act or practice for a new car dealer or a used car dealer to violate any provision of a

federal or state statute or regulation concerning the sale or lease of motor vehicles.'" (quoting Conn. Agency Reg. § 42-110b-28(b)(23))).

Additionally, it is "an unfair or deceptive act or practice for a new car dealer or used car dealer to fail to sell or lease . . . a motor vehicle in accordance with . . . the advertised price." Conn. Agencies Regs. § 42-110b-28(b)(1); *see Freeman*, 174 Conn. App. at 664 (affirming a trial court finding that a used car dealer violated § 42-110b-28(b)(1) by refusing to sell a car to the plaintiff at the advertised price and, "instead, requir[ing] that she either pay more for the vehicle or buy additional service type contracts that she did not want"). Violation of this regulation is a *per se* CUTPA violation. *See Negron v. Patriot Auto Sales*, LLC, No. 3:17-cv-583 (JCH), 2019 WL 4463440, at *2 (D. Conn. Sept. 17, 2019) ("42-110b-28(b)(1) of the Connecticut Agencies Regulations[ ] makes it a *per se* violation of CUTPA for car dealers to sell vehicles for more than their advertised price.").

Since reliance is not required for CUTPA claims, the buyer does not need to have seen or relied upon the advertised price before buying the car in order to establish a car dealer's liability. *See Konikowski v. Stephen Cadillac GMC, Inc.*, No. X-03-HHD-CV-176078564-S, 2017 WL 7048666, at *4 (Conn. Super. Ct. Dec. 27, 2017) (observing that Conn. Gen. Stat. §§ 14-62a and Conn. Agencies Regs. §§ 42-110b-28(b)(1) and (23) do not "require[] knowledge on the part of the consumer of the advertised terms and conditions").

"It is well established that '[t]he CUTPA plaintiff need not prove reliance or that the representation became part of the basis of the bargain." *Meyers v. Cornwell Quality Tools, Inc.*, 41 Conn. App. 19, 35 (1996) (quoting *Associated Inv. Co. P'ship v. Williams Assocs. IV*, 230 Conn. 148, 158 (1994)); *see also Konikowski*, 2017 WL 7048666, at *4 (denying a used car dealer defendant's motion to strike based on the plaintiff's lack of reliance on the advertised sale

23

price "[b]ecause reliance is neither an element of CUTPA nor central to the plaintiff's theory of the case").

Mr. Hernandez claims that Apple Auto engaged in unfair and deceptive acts and practices in violation of CUTPA because (a) it violated the Truth and Lending Act; (b) it knowingly sold him an unsafe and unmerchantable car; (c)–(d) it failed to disclose the Vehicle's defects in the Form K-208 as required by Conn. Gen. Stat. § 14-62(g); (e) it failed to perform a safety inspection on the Vehicle or, if it did perform a safety inspection, it sold the Vehicle notwithstanding the defects; (f) it sold the Vehicle for more than the advertised price, in violation of Conn. Agency Reg. § 42-110b-28(b)(1); and (g) it falsely stated that Mr. Hernandez paid $1,000, rather than the $500 Mr. Hernandez alleges he paid. Compl. ¶ 53(a)–(g).

A violation of the Truth in Lending Act may constitute a CUTPA violation if the consumer can show substantial injury. *See Cheshire Mortg.*, 223 Conn. at 113–14 (finding a TILA violation constituted a CUTPA violation where home buyers were charged a prepaid finance charge of $490, or "a full percentage point above the maximum 10 percent of the principal amount of the loan that a lender may charge to a borrower pursuant to § 36–224l.").

Mr. Hernandez asserts that Apple Auto sold the Vehicle to him for a stated cash price of $12,650 despite advertising the vehicle for only $11,495. Pl.'s Mem. at 12–13. He also asserts that the stated price falsely incorporated an additional $500 down payment which he claims he was never asked for and never paid. Pl.'s Mem. at 12. In support of these assertions, Mr. Hernandez offers his own affidavit, the Contract, and a copy of an advertisement which he claims shows Apple Auto was advertising the car at a lower price. *See* Hernandez Aff. ¶¶ 2, 5–8; Contract; Apple Auto Ad. Additionally, while the advertisement clearly references the same Vehicle (evidenced by the Vehicle Identification Number) and lists a price of $11,495, *see* Apple

Auto Ad, there is no date indicating when the advertisement was current. Instead, the ad reflects a date of August 9, 2017, when Mr. Hernandez apparently accessed a stored version of the webpage through his Google cache. Thus, while the allegations may establish liability for purposes of default judgment, evidence submitted Mr. Hernandez leaves some doubt as to whether the advertisement actually reflected the price of the Vehicle at the time Mr. Hernandez purchased it or some earlier price.

But the Court need not rely only on Mr. Hernandez's allegations regarding the advertised price as his well-pleaded allegations establish Apple Auto's liability under CUTPA for multiple other reasons as well. As the Court has explained, record evidence shows that Apple Auto inflated the price of his contract by stating that Mr. Hernandez had made a $1000 down payment rather than the $500 Mr. Hernandez has attested to paying. Mr. Hernandez also claims that Apple Auto failed to perform a safety inspection on the car as required by Conn. Gen. Stat. § 14-62(g); or if Apple Auto did perform the inspection, it failed to disclose the Vehicle's defects on the Form K-208 and sold the Vehicle notwithstanding the defects. Conn. Gen. Stat. § 14-62(g) requires that a car dealer, "[b]efore offering any used motor vehicle for retail sale," must "complete a comprehensive safety inspection of such vehicle. . . . and such inspection shall be evidenced on a form approved by the commissioner." Conn. Gen. Stat. § 14-62(g). The law requires "[t]he selling dealer [to] attest to such form under the penalty of false statement . . . and [to] state that the vehicle has undergone any necessary repairs and has been deemed to be in condition for legal operation on any highway of this state." *Id.*

As required by Conn. Gen. Stat. § 14-62g, the Form K-208 contains spaces for the dealer to deem the vehicle "to be in condition for legal operation on any highway of this state," or to note that the vehicle is being sold "as is," either with or without defects. *See* Form K-208. But

none of those spaces are checked on the Form K-208 that Apple Auto completed. This failure to attest to the condition of the car—either defective or not—constitutes a violation of Conn. Gen. Stat. § 14-62(g).

Moreover, as the Court has explained, both the well-pleaded allegations and the evidence in the record show that the Vehicle was defective at the time Apple Auto purchased it. *See* CarFax Report (showing that the Vehicle had been in prior reported accidents and that it had been sold at auction on April 19, 2017, with a disclosure by the seller of structural damage); Collins Report at 1, 3 (finding, less than a month after Mr. Hernandez purchased the Vehicle, that it had structural damage and was "not safe to operate on public roads," and that it had been repaired just enough "to provide the minimum level of repair that would be acceptable to the average consumer's untrained eye."). Yet the Form K-208 did not indicate any damage to any of the items inspected. Form K-208. Most notably, the Form K-208 indicated that the frame/chassis passed inspection, *id.*; but Mr. Collins found that the structural damage to the Vehicle's frame would "result in greater penetration into the cabin in a subsequent collision . . . increas[ing] the risk to all passengers in the vehicle for bodily injury and death." Collins Report at 2.

The evidence thus shows that either Apple Auto did not complete a comprehensive safety inspection, or it failed to disclose a structural defect, either of which would violate Conn. Gen. Stat. § 14-62(g). And, in any event, Apple Auto violated Conn. Gen. Stat. § 14-62(g) by failing to attest to the condition of the Vehicle. As a result, Mr. Hernandez will be granted default judgment against Apple Auto on his CUTPA claim based on Apple Auto's violation of Conn. Gen. Stat. § 14-62(g).

Mr. Hernandez also is entitled to default judgment against Apple Auto based on his claim that Apple Auto knowingly sold him an unsafe and unmerchantable car. The Court has already

found that Mr. Hernandez is entitled to default judgment for Apple Auto's breach of the implied

warranty of merchantability. "[C]ourts in Connecticut have held that negligent misrepresentation

is an aggravating factor elevating a breach of contact claim to a violation of CUTPA." *Alexis*,

2018 WL 5456491, at *5 (citing *Montanez v. D & D Auto, LLC*, No. 3:15-cv-397 (VAB), 2016

WL 1254199, at *14 (D. Conn. Mar. 29, 2016) (collecting cases and holding that the plaintiff

stated a claim under CUTPA by alleging negligent misrepresentation in connection with a car

sale)).

Based on the well-pleaded allegations and evidence which the Court has now discussed

extensively, the Court concludes that Apple Auto knew or should have known that the Vehicle

was unsafe or unmerchantable at the time it sold the Vehicle. Furthermore, as the Court has

explained, Mr. Hernandez reasonably relied on Apple Auto's representation, through the Form

K-208, that the car was safe and merchantable. Such "negligent misrepresentation thus raised its

breach of its express warranty and the warrant of merchantability to the level of a CUTPA

violation." *Alexis*, 2018 WL 5456491, at *5 (finding that plaintiffs stated a CUTPA claim by

alleging that the car dealer knew or should have known that the car was unsafe to drive and that

they purchased the car based on the dealer's representation that the car was safe). Accordingly,

the Court will grant Mr. Hernandez default judgment on his CUTPA claims against Apple Auto

based on his Truth and Lending Act claim, Apple Auto's negligent misrepresentation of the

safety and merchantability of the car, and its failure to comply with safety inspection

requirements under Conn. Gen. Stat. § 14-62(g).

### E. Damages

When awarding damages upon default judgment, a court may conduct a hearing or it may

make such a finding on the basis of documentary evidence if damages are ascertainable with

reasonable certainty." *Chance*, 2017 WL 5515951, at *1 (citing *Alcantara*, 183 F.3d at 155).
Where "plaintiffs have filed reasonably detailed declarations and exhibits pertaining to the
damages incurred, and where the defendant has failed to make an appearance in the case, the
Court can make an informed decision regarding damages without an evidentiary hearing."
*Llaurador-Perez*, 2014 WL 5780706, at *5 (internal citation, quotation marks, and alterations
omitted).

Mr. Hernandez claims actual damages, statutory damages under TILA, punitive damages
under CUTPA, common law punitive damages, and attorney's fees and costs. He has submitted
sufficiently detailed declarations and exhibits to permit the Court to grant damages without an
evidentiary hearing.

### 1.   Actual Damages

Under CUTPA, a "plaintiff is entitled to recover her actual damages plus, in the court's
discretion, costs, attorneys['] fees and punitive damages." *Tirado*, 2008 WL 902506, at *14
(citing Conn. Gen. Stat. § 42-110g).

Consumers may also recover incidental and consequential damages for a seller's breach
of the implied warranty of merchantability:

> (1) Incidental damages resulting from the seller's breach include
> expenses reasonably incurred in inspection, receipt, transportation
> and care and custody of goods rightfully rejected, any commercially
> reasonable charges, expenses or commissions in connection with
> effecting cover and any other reasonable expense incident to the
> delay or other breach.
>
> (2) Consequential damages resulting from the seller's breach
> include (a) any loss resulting from general or particular
> requirements and needs of which the seller at the time of contracting
> had reason to know and which could not reasonably be prevented by
> cover or otherwise; and (b) injury to person or property proximately
> resulting from any breach of warranty.

Conn. Gen. Stat. Ann. § 42a-2-715. *See also Tirado*, 2008 WL 902506, at \*\*6–7 (citing 15

U.S.C. § 2310(d) ("If a consumer finally prevails in any action brought under paragraph (1) of

this subsection, [including breach of implied warranty,] he may be allowed by the court to

recover as part of the judgment a sum equal to the aggregate amount of cost and expenses

(including attorneys 'fees based on actual time expended) determined by the court to have been

reasonably incurred by the plaintiff.").

Additionally, "[w]hen a buyer justifiably revokes acceptance, he may cancel and recover

so much of the purchase price as has been paid." *Tirado*, 2008 WL 902506, at \*9 (citing Conn.

Gen. Stat. § 42a-2-711)).

Based on the Purchase Order, the Contract, Mr. Hernandez's affidavit, and Mr. Collins's

affidavit, Apple Auto is liable to Mr. Hernandez for the amount Mr. Hernandez paid under the

Contract plus $650 for the cost of Mr. Collins's inspection. *See Alexis*, 2018 WL 5456491, at

\*\*4–5 (finding that buyers were entitled to damages for their down payment and reasonable

attorneys' fees where they had "revoked their acceptance of the car on August 28, 2017, after

they learned that they had been misled in making the purchase and that the car was unsafe to

drive;" but finding that buyers had not shown that they are entitled to damages based on

inspection fees because their affidavit did not address the cost of the inspection).

Because Mr. Hernandez has provided evidence of having paid $500 under the Contract,

and the $1000 worth of trade-in value of his former car, the Court grants summary judgment as

to actual damages in the amount of $1,500. The Court will also grant incidental damages in the

amount of $650 for the inspection of the Vehicle Mr. Hernandez purchased, giving him a total of

$2,150 in compensatory damages. *See* Pl.'s Mem. at 15; *see also* Ruling and Order on Renewed

Mot. for Damages, *Alexis*, No. 3:17-cv-1622 (MPS), ECF No. 22 at 1 (D. Conn. Nov. 9, 2018)

(including incidental damages of $650 for vehicle inspection in award of compensatory damages); *Dunleavey v. Paris Ceramics USA, Inc.*, No. CV-020395709-S, 2005 WL 1094424, at *1 (Conn. Super. Ct. Apr. 20, 2005) ("The general rule in breach of contract cases is that the award of damages is designed to place the injured party, so far as can be done by money, in the same position as that which he would have been in had the contract been performed." (quoting *Ambrogio v. Beaver Road Assocs.*, 267 Conn. 148, 155 (2003))), *aff'd*, 97 Conn. App. 579 (2006)).

### 2.   Statutory Damages under the Truth in Lending Act

A defendant who violates TILA's disclosure requirements is liable for "'(1) any actual damage sustained by such person as a result of the failure' and '(2) in the case of an individual action twice the amount of any finance charge in connection with the transaction . . . except that the liability under this subparagraph shall not be less than $200 nor greater than $2,000.'" *Lopez Motors*, 2018 WL 1582552, at *4 (quoting 15 U.S.C. § 1640(a)).

Mr. Hernandez's finance charge was $4,231.31, which exceeds the statutory maximum damages. Pl.'s Mem. at 9; Contract. He therefore is entitled to the statutory maximum of $2,000 for Apple Auto's TILA violation.

### 3.   Attorney's Fees and Costs

As a result of the underlying statutory violation, Apple Auto is liable for reasonable attorney's fees and costs under TILA. *See Lopez Motors*, 2018 WL 1582552, at *4 (citing TILA at 15 U.S.C. § 1640(a)(3) (providing that a creditor who fails to comply with TILA requirements is liable for "the costs of the action, together with a reasonable attorney's fee as determined by the court")). The Court also may award reasonable attorney's fees and costs under CUTPA. *See Artie's Auto Body, Inc. v. Hartford Fire Ins. Co.*, 317 Conn. 602, 623 (2015) (citing CUTPA at

Conn. Gen. Stat. § 42-110g ("[T]he court may award . . . costs and reasonable attorneys' fees based on the work reasonably performed by an attorney[.]")).

Additionally, because the Court has found that Apple Auto is liable for breach of the implied warranty of merchantability, the Court also may award Mr. Hernandez attorney's fees and costs under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq*. While "The MMWA does not create a basis for liability in addition to the plaintiff's state law claims; it provides consumers with access to federal court on breach of warranty claims and also allows them to recover attorney's fees if they prevail on those claims . . . ." *Jacques v. A Better Way Wholesale Autos, Inc.*, No. CV-17-6013046-S, 2019 WL 254304, at *2 (Conn. Super. Ct. Jan. 17, 2019) (quoting 15 U.S.C. § 2310(d)(2)); *see also Alexis*, 2018 WL 5456491, at *5 ("The federal MMWA does not create a separate cause of action, but allows a plaintiff who is successful on a state-law breach of warranty claim to recover attorneys' fees and costs.").

To determine attorney's fees, "a district court should consider the rate [a] reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee." *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 193 (2d Cir. 2008).

To determine a "reasonable" hourly rate, this Court should consider factors including, but not limited to, the following:

> the complexity and difficulty of the case, the available expertise and capacity of the client's other counsel (if any), the resources required to prosecute the case effectively (taking account of the resources being marshaled on the other side but not endorsing scorched earth tactics), the timing demands of the case, whether an attorney might have an interest (independent of that of his client) in achieving the ends of the litigation or might initiate the representation himself, whether an attorney might have initially acted pro bono (such that a client might be aware that the attorney expected low or non-existent

> remuneration), and other returns (such as reputation, etc.) that an
> attorney might expect from the representation.

*Id.* at 184. This Court should also consider the prevailing market rates charged in the district
where the plaintiff brought the case. *Id.* at 190.

Then, to arrive at a "presumptively reasonable fee," this Court should multiply "a
reasonable hourly rate [by] the reasonable number of hours required by the case." *Millea v.
Metro-North Ry. Co.,* 658 F.3d 154, 166 (2d. Cir. 2011); *see also Silver v. Law Offices Howard
Lee Schiff, P.C.*, No. 3:09-cv-912 PCD, 2010 WL 5140851, at *2 (D. Conn. Dec. 16, 2010)
("After determining the reasonable hourly rate for an attorney, the Court must examine the hours
expended by the attorney, review them for reasonableness, and exclude any excessive or
unnecessary hours." (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

Mr. Hernandez seeks attorney's fees and costs for work performed by two attorneys, one
paralegal, and one legal assistant. Pl.'s Mem. at 26; Blinn Decl. ¶ 12. He requests $400 per hour
for Daniel Blinn, Esq.; $275 per hour for Brendan L. Mahoney, Esq.; $150 per hour for Lori
Miner, paralegal; and $95 per hour for Dora Fernandez, legal assistant. *Id.*

After reviewing the parties' submissions, including itemized charges and a declaration
submitted by Mr. Hernandez's lead attorney, Mr. Blinn, the Court concludes that the rates sought
by Mr. Hernandez's attorneys are reasonable.

Plaintiff's counsel, Daniel Blinn, is the founder and Managing Attorney of Consumer Law
Group, LLC, a private law firm established in 1997 that focuses on representing consumers against
business entities and advancing consumer protection and rights. Blinn Decl. ¶ 2. Mr. Blinn has
practiced law for more than thirty years, and he has handled more than 1,200 cases involving car
dealerships during that time. *Id.* ¶¶ 3–4. He is a former and the current chair of the Consumer Law
Section of the Connecticut Bar and has served on the national board of directors of the National

Association of Consumer Advocates ("NACA"). *Id.* ¶¶ 5–6. He served for five years as the Treasurer of NACA and served as the chair of NACA's Connecticut chapter for more than eight years. *Id.* ¶¶ 6–7. He also is a regular presenter at conferences run by NACA, the National Consumer Law Center, and the Connecticut Bar Association, and he served as co-chair for the 2018 NACA Auto Dealer Fraud Conference. *Id.* ¶¶ 8–9.

In 2012, United States Magistrate Judge Thomas P. Smith referred to Mr. Blinn along with attorney Joanne Faulkner as "the two preeminent consumer law attorneys in th[e] District [of Connecticut]." *Negron v. Mallon Chevrolet, Inc.*, No. 3:08-cv-182 TPS, 2012 WL 4358634, at *2 (D. Conn. Sept. 24, 2012) (awarding fees to a different attorney, referring to attorneys Blinn and Faulkner as comparators who, in 2010, had hourly billing rates of $325 and $350 per hour, respectively). Several courts in this District since have awarded $400 per hour in attorney's fees for Mr. Blinn's work under TILA, CUTPA, and MMWA, including against auto dealers. *See*, Order Re: Motion for Post-Appeal Attorney's Fees, *Smith v. Better Way Wholesale Autos, Inc.*, No. 3:15-cv-599 (AWT), ECF No. 38 (D. Conn. Oct. 26, 2017) (awarding $400 per hour for Mr. Blinn's work on a case against defaulting auto dealer under TILA and MMWA, among other claims); Memorandum of Decision, *Franco v. A Better Way Wholesale Autos*, No. 3:14-cv-422 (VLB), ECF No. 62 (D. Conn. May 31, 2016) (awarding fees for Mr. Blinn's work under TILA, stating: "This Court has already determined that a rate of $400 per hour for work performed by experienced counsel in relation to similar federal statutes is reasonable." (*citing Bundy v. NCE Fin. Srvs. Inc.*, No. 3:10-cv-1462 (VLB), ECF No. 23 (Dec. 14, 2010))); Order Re Motion for Suppl. Attorney's Fees, *Dixon v. A Better Way Wholesale Auto, Inc.*, No. 3:15-cv-691 (AWT), ECF No. 60 (Oct. 27, 2017) (awarding $400 per hour for Mr. Blinn's work on a case under TILA and CUTPA, among other claims); Endorsement Order Granting Motion for Attorney's Fees, *Bristol v. Trudon*, No. 3:13-cv-911 (JBA), ECF No. 57 (D. Conn. June 27, 2014) (awarding $400

per hour for Mr. Blinn's work on a case against defaulting auto dealer under TILA, CUTPA, and MMWA, for "reasonable hours expended at reasonable rates by a well respected consumer law attorney and firm"); Order and Final Judgment of Dismissal, *Linsley v. FMS Investment Corp.*, No. 3:11-cv-961 (VLB), ECF No. 75 (D. Conn. June 2, 2014) (approving settlement including $400 per hour for Mr. Blinn's work on case brought under CUTPA, among other claims). Mr. Blinn's requested rate of $400 in a case under TILA, CUTPA, and MMWA is therefore reasonable now, in 2020.

Mr. Hernandez states that his other counsel, Brendan Mahoney, has been admitted to the practice of law for four years and that he is a member of the consumer law section of the Connecticut Bar Association and a member of NACA. Pl.'s Mem. at 27. Mr. Blinn declares that Mr. Mahoney is his associate at the Consumer Law Group, and that his billing rate is $275. Blinn Decl. ¶ 12. Although no declaration or affidavit supports Plaintiff's contentions regarding Mr. Mahoney's experience, another court in this District has found that $275 per hour is a reasonable rate for Mr. Mahoney as Blinn's associate attorney. *See* Order on Pl.'s Motion for Attorney's Fees, *Panfili v. Rides By Ryan LLC*, No. 3:17-cv-290 (SRU), ECF No. 31 (D. Conn. July 16, 2018) (granting fees and costs for the work of Mr. Blinn, Mr. Mahoney, Ms. Miner, and Ms. Fernandez, based on Mr. Blinn's declaration, ECF No. 17-2). This Court agrees that $275 per hour is a reasonable hourly rate for Mr. Mahoney.

Courts have also found that the same hourly rates sought for Ms. Miner's work and Ms. Fernandez's work with Mr. Blinn were reasonable. *See* Blinn Decl., *Panfili*, No. 3:17-cv-290 (SRU), ECF No. 17-2 (seeking $150 per hour for Ms. Miner and $95 per hour for Ms. Fernandez); Blinn Decl., *Dixon*, No. 3:15-cv-691 (AWT), ECF No. 51-2 (seeking $150 per hour for Ms. Miner); Blinn Decl., *Franco*, No. 3:14-cv-422 (VLB), ECF No. 50-2 (seeking $150 per

hour for Ms. Miner and $95 per hour for Ms. Fernandez[7]). The Court agrees that $150 per hour is reasonable for Ms. Miner's work and $95 per hour is reasonable for Ms. Fernandez's work.

The Court also finds that the hours expended by Plaintiff's attorneys are reasonable, and that no hours described in Plaintiff's counsel's detailed business hours, Blinn Decl. Ex. A, ECF No. 86-6 at 4–23, are excessive or unnecessary. These reasonable hours include the hours expended by Ms. Miner and Ms. Fernandez, because the itemized records demonstrate that their work was not "purely clerical or secretarial tasks" that would be unrecoverable, *see Durso v. Colvin*, No. 314-cv-67 (WWE) (JGM), 2015 WL 5684039, at *3 (D. Conn. Sept. 28, 2015) (internal citation and quotation marks omitted); but rather that they actively participated in the litigation of this case, *see Serricchio v. Wachovia Sec., LLC*, 706 F. Supp. 2d 237, 260 (D. Conn. 2010) ("Because [the paralegal] did not 'sit[ ] idly' as [d]efendant's counsel suggest, but rather, is represented to have played the supportive role for Plaintiff's counsel during trial, which warrants fees, her hours spent in trial will be awarded in full."), *aff'd*, 658 F.3d 169 (2d Cir. 2011).

Mr. Blinn represents that the amount of fees sought, $18,000, "incorporates a voluntary reduction of approximately 10% from the total value of the time due to inefficiencies and duplication of work." Pl.'s Mem. at 26; *see also* Blinn Decl. ¶¶ 18–19. Having found the hourly rates and hours expended to be reasonable, the Court will not reduce the award sought any further than Plaintiff's counsel has already reduced it.

Accordingly, the Court will grant the attorney's fees and costs sought by Plaintiff in full, in the amount of $18,000.

---

[7] Judge Bryant did note in her memorandum of decision on attorney's fees that Mr. Blinn's declaration in *Franco* contained a typo: "the rate charged for counsel's legal assistant was $95/hour, not $90/hour." *Franco*, No. 3:14-cv-422 (VLB), ECF No. 62 at 2 n.1.

### 4. Punitive Damages

A "court may, in its discretion, award punitive damages" under CUTPA. Conn. Gen. Stat.

§ 42-110g(a). "In order for the court to award punitive . . . damages under CUTPA, the evidence

must reveal a reckless indifference to the rights of others or an intentional and wanton violation

of those rights." *Larobina v. Home Depot, USA, Inc.*, 76 Conn. App. 586, 597–98 (2003)

(quoting *Gargano v. Heyman*, 203 Conn. 616, 622 (1987) (internal quotation marks and

alterations omitted)); *see also Lydall, Inc. v. Ruschmeyer*, 282 Conn. 209, 245 (2007) ("Punitive

damages may be awarded only for outrageous conduct, that is, for acts done with a bad motive or

with a reckless indifference to the interests of others." (internal citation and alterations omitted)).

"While the CUTPA statutes do not provide a method for determining punitive damages, courts

generally award punitive damages in amounts equal to actual damages or multiples of the actual

damages." *Quinitchet v. Jemison*, No. HHD-CV-176084848-S, 2019 WL 1504007, at *3 (Conn.

Super. Ct. Feb. 22, 2019) (quoting *Advanced Fin. Servs., Inc. v. Associated Appraisal Servs.,

Inc.*, 79 Conn. App. 22, 34 (2003)); *see also Larobina*, 76 Conn. App. at 590, 590 n.5 (upholding

a punitive damages award of $1000, ten times the $100 actual damages, based on a finding that

the defendant's conduct was reckless.); *Bridgeport Harbour Place I, LLC v. Ganim*, 131 Conn.

App. 99, 149 (2011) (affirming an award of $60,000, six times the actual damages); *Benham v.

Wallingford Auto Park, Inc.*, No. CV-020459418-S, 2003 WL 22905163, at *5 (Conn. Super. Ct.

Nov. 26, 2003) (awarding $35,000 in punitive damages, seven times the actual damages).

Mr. Hernandez also seeks common law punitive damages. "Under Connecticut law,

punitive damages are available for a claim of breach of warranty if plaintiff alleges conduct that

is 'done with a bad motive or with a reckless indifference to the interests of others.'" *Alexis*,

2018 WL 5456491, at *5 (quoting *Makuch v. Stephen Pontiac-Cadillac, Inc.*, No. 3:12-cv-866

(WWE), 2013 WL 45887, at *2 (D. Conn. Jan. 3, 2013)). "Common law punitive damages cannot exceed the plaintiff's expenses of litigation, less his taxable costs." *Id.* (quoting *Berry v. Loiseau*, 223 Conn. 786, 832 (1992)) (internal quotation marks omitted).

Mr. Hernandez argues that punitive damages are warranted against Apple Auto because it "sold Plaintiff an unsafe Vehicle and failed even to return his calls when he attempted to have the dealership repair his Vehicle," and because Apple Auto "charg[ed] him more than the advertised price for the Vehicle and misrepresent[ed] his down payment." Pl.'s Mem. at 16. Mr. Hernandez seeks punitive damages of five times his actual damages. *Id.*

The Court agrees.

As explained above, the record evidence shows that Apple Auto knew or should have known that the Vehicle it sold was unsafe to drive, evidence of Apple Auto's reckless conduct. *See Larobina*, 76 Conn. App. at 598 (upholding a finding of "reckless indifference to the rights of the plaintiff by its use of a confusing and misleading combination of documents to reflect a relatively simple transaction"). Mr. Hernandez thus is entitled to punitive damages. *See Alexis*, 2018 WL 5456491, at *5 (ruling on default judgment against the defendant, finding: "The complaint alleges that [the defendant] knew or should have known that the car was unsafe to drive. [The defendant] nevertheless sold the [plaintiffs] the car and misrepresented its condition. As a result, I find that the [plaintiffs] are entitled to reasonable attorneys' fees, either as common law punitive damages or under the MMWA.").

Because "in terms of consistency or frequency, punitive damage awards under CUTPA are generally equal to or twice the amount of the compensatory award," *Bridgeport Harbour Place*, 131 Conn. App. at 145, the Court will award punitive damages equal to the compensatory damages, a reasonable number to achieve the goal of deterrence. *See Alexis*, 2018 WL 5456491,

at *6 ("[P]unitive damages are appropriate in this case to deter similar misconduct in the future, and an award equal to . . . compensatory damages is reasonable to achieve that goal.").

Accordingly, the Court will award Mr. Hernandez punitive damages in the amount of $2,150, an amount equal to his compensatory damages of $2,150.

## IV.   CONCLUSION

For the foregoing reasons, Mr. Hernandez's motion for default judgment against Apple Auto is **GRANTED**.

Default judgment is granted as to Apple Auto's liability under the Truth in Lending Act, for breach of the implied warranty of merchantability, revocation of acceptance under Conn. Gen. Stat. § 42a-2-608, and under CUTPA claims based on Apple Auto's violation of the Truth in Lending Act, negligent misrepresentation of the safety and merchantability of the car and its failure to comply with safety inspection requirements under Conn. Gen. Stat. § 14-62(g).

Because Mr. Hernandez validly revoked acceptance of the Vehicle, the Court further orders that the Contract is cancelled.

The Court awards actual damages in the amount of $1,500, incidental damages in the amount of $650, statutory damages under TILA in the amount of $2,000, attorney's fees and costs in the amount of $18,000, and punitive damages in the amount of $2,150. In sum, Mr. Hernandez is awarded $24,300 against Apple Auto.

Mr. Hernandez's motion for summary judgment is **DENIED** without prejudice; and Westlake's motion for summary judgment is **DENIED** without prejudice.

**SO ORDERED** at Bridgeport, Connecticut, this 18th day of May, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE