**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ISAAC HERNANDEZ,<br>        *Plaintiff*,<br><br>        v.<br><br>APPLE AUTO WHOLESALERS OF<br>WATERBURY LLC and WESTLAKE<br>SERVICES, LLC d/b/a WESTLAKE<br>FINANCIAL SERVICES,<br>        *Defendants.* | No. 3:17-cv-1857 (VAB) |

**RULING AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Isaac Hernandez bought a car from Apple Auto Wholesalers of Waterbury LLC ("Apple Auto") in July 2017 and financed it through an installment contract. Apple Auto assigned the installment contract to Westlake Services, LLC, doing business as Westlake Financial Services ("Westlake").

Mr. Hernandez has sued both Apple Auto and Westlake under federal and state law, seeking actual and punitive damages as well as attorney's fees and costs. Compl., ECF No. 1 (Nov. 3, 2017).

The Court granted default judgment for Mr. Hernandez against Apple Auto after entering a default entry for failure to defend against Mr. Hernandez's claims. Ruling and Order on Mots. for Summ. J. and Mot. for Default J., ECF No. 100 (May 18, 2020) ("Default J. Order"). Accordingly, only Mr. Hernandez's claims against Westlake remain.

After Mr. Hernandez and Westlake cross-moved for summary judgment, the Court certified to the Connecticut Supreme Court three questions relating to the interpretation of

Connecticut General Statutes § 52-572g. Order Certifying Questions to the Conn. Sup. Ct., ECF No. 101 (May 18, 2020) ("Certification Order"). That statute authorizes a consumer such as Mr. Hernandez, who finances a purchase through an installment contract, to assert against the holder of the contract any claims or defenses that the consumer would be able to assert against the seller directly. At the same time, the Court denied without prejudice both parties' motions for summary judgment. Default J. Order at 1–2.

The Connecticut Supreme Court has issued an opinion answering the certified questions. *Hernandez v. Apple Auto Wholesalers of Waterbury, LLC*, 338 Conn. 803 (2021). The parties have also filed supplemental briefs addressing the impact of that opinion. The Court now takes up the cross-motions for summary judgment again.

For the following reasons, Mr. Hernandez's motion for summary judgment against Westlake is **GRANTED**, and Westlake's motion for summary judgment is **DENIED**.

Westlake is liable to Mr. Hernandez under § 52-572g for up to $12,442.13 and liable under the Federal Trade Commission's (FTC) Holder Rule for up to $1,500. Thus, Westlake's maximum liability to Mr. Hernandez is $13,942.13.

Westlake is liable for each claim Mr. Hernandez asserted against Apple, except for the Truth in Lending Act claim. The Court awarded Mr. Hernandez $22,300 against Apple for these claims, which exceeds Westlake's maximum liability.

Accordingly, the Court awards Mr. Hernandez the maximum amount of $13,942.13 against Westlake.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

A.   **Factual Background**[1]

In July of 2017, Mr. Hernandez agreed to purchase a 2011 Ford Taurus (the "Vehicle")

for personal use from Apple Auto and made a down payment of $500. Local Rule 56(a)(1)

Statement ¶¶ 1–2, ECF No. 86-5 (Sept. 6, 2019) ("Pl.'s SOMF"); Hernandez Aff. ¶¶ 1, 3–4, ECF

No. 86-3 (Aug. 26, 2019). As part of the payment arrangement, Mr. Hernandez traded in a 2003

Volkswagen Jetta, for which Apple Auto gave him a trade-in allowance of $1,000. Pl.'s SOMF ¶

3; Hernandez Aff. ¶ 3.

On July 20, 2017, Apple Auto presented Mr. Hernandez with a Retail Purchase Order

that listed a cash sale price of $12,650 for the Vehicle. Pl.'s SOMF ¶ 4; Hernandez Aff. ¶ 5;

Hernandez Aff. Ex. B at 12–13, ECF No. 86-3 (Retail Purchase Order (July 20, 2017))

("Purchase Order"). The Purchase Order states that Mr. Hernandez made a cash payment of

$1,000. *Id.*

---

[1] The District of Connecticut's Local Rule 56(a) requires that

> A party opposing a motion for summary judgment shall file and serve with the
> opposition papers a document entitled "Local Rule 56(a)2 Statement of Facts in
> Opposition to Summary Judgment," which shall include . . . a response to each
> paragraph admitting or denying the fact and/or objecting to the fact as permitted
> by Federal Rule of Civil Procedure 56(c).

D. Conn. L. Civ. R. 56(a)2(i). Furthermore, "[e]ach denial . . . must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." *Id.* 56(a)3. "When a party fails to appropriately deny material facts set forth in the movant's Rule 56(a)(1) statement, those facts are deemed admitted." *Knight v. Hartford Police Dep't*, No. 3:04-cv-969 (PCD), 2006 WL 1438649, at *4 (D. Conn. May 22, 2006) (citing *SEC v. Glob. Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004)).

Westlake did not submit a Local Rule 56(a)2 Statement of Facts. As a result, the Court deems Plaintiff's Local Rule 56(a)1 Statement to be admitted for purposes of this motion. The Court will not rely, however, on Plaintiff's assertions if they are unsupported by admissible evidence in the record. *See* D. Conn. L. Civ. R. 56(a)3 (providing that if a non-moving party fails to provide specific citations to evidence in the record, the Court may "deem[] admitted certain facts [in the movant's Statement of Material Facts] that are supported by the evidence in accordance with Local Rule 56(a)1"); *Johnson v. Conn. Dep't of Admin. Servs.*, 972 F. Supp. 2d 223, 229 (D. Conn. 2013) ("Where a statement is not supported by the record, the Court either notes such or does not rely on the purported fact in its determination."), *aff'd*, 588 F. App'x 71 (2d Cir. 2015).

On July 20, 2017, Apple Auto prepared a Retail Installment Contract (the "Contract") for the Ford Taurus that listed a cash price of $13,427.82, which included $777.82 in sales tax, a trade-in allowance of $1,000, and a cash payment of $1,000. Pl.'s SOMF ¶ 7; Hernandez Aff. ¶ 8; Hernandez Aff. Ex. C at 14–18, ECF No. 86-3 (Retail Installment Contract (July 20, 2017)) ("Contract"). The Contract listed the financed amount as $12,206.82, which included a $4,231.31 finance charge, and payments of $400.93 per month for forty-one months, starting on September 3, 2017. Pl.'s SOMF ¶ 9; Contract. The Contract listed the total amount payable, including the down payment and installment payments, as $18,438.12. Pl.'s SOMF ¶ 10; Contract.

Apple Auto also provided Mr. Hernandez a vehicle inspection Form K-208, required by state law,[2] which indicated that the Ford Taurus passed inspection for all items inspected. Form K-208. Apple Auto signed the form on July 18, 2017. *Id.* Mr. Hernandez signed the form as the buyer but did not indicate the date of his signing. *Id.*

Shortly after Mr. Hernandez purchased the Vehicle, Apple Auto assigned the Contract to Westlake. Pl.'s SOMF ¶ 12; Hernandez Aff. ¶ 13.

After he purchased the vehicle, Mr. Hernandez discovered an online advertisement by Apple Auto for the same Ford Taurus and learned that Apple Auto had at some point[3] advertised

---

[2] The Form K–208 states that "[t]his report shall be used by a CT licensed dealer to comply with [Conn. Gen. Stat. § 14-62(g)] and must be completed in its ENTIRETY. Before offering any used motor vehicle for retail sale, the selling dealer shall complete a comprehensive safety inspection of such vehicle." Hernandez Aff. Ex. D at 20, ECF No. 86-3 (Conn. Dep't of Motor Vehicles, *Vehicle Inspection Form* (July 18, 2017)) ("Form K-208").

[3] Mr. Hernandez alleges that the online ad represents Apple Auto's advertised price for the car "[p]rior to July 17, 2017." Pl.'s SOMF ¶ 1; Hernandez Aff. ¶ 1. The copy of the advertisement appended as Exhibit A, however, does not contain a date for the advertisement. *See* Hernandez Aff. Ex. A, ECF No. 86-3 (*Used 2011 Ford Taurus SHO*, Apple Auto Wholesalers, www.appleautoct.com (accessed through user's Google internet cache Aug. 9, 2017)) ("Apple Auto Ad"). Instead, it reflects a date of August 9, 2017, when Mr. Hernandez apparently accessed a stored version of the webpage through his Google cache.

An internet "cache" file is a temporary storage folder "containing copies of previously viewed web pages which have not been updated" in an individual web user's search engine. *In re Whitehall Ave., LLC*, No. 12-21184, 2014 WL 1329354, at *8 (Bankr. D. Conn. Apr. 1, 2014) ("[S]earch engines, *inter alia*, commonly use cached files to

the same Ford Taurus online for $11,495. Pl.'s SOMF ¶¶ 1, 4; Hernandez Aff. ¶¶ 2, 5; Apple

Auto Ad at 5–10.

"Immediately after taking delivery" of the Vehicle, Mr. Hernandez also "noticed that the

Vehicle would shake when being driven and would make noises during braking." Pl.'s SOMF

¶ 14; Hernandez Aff. ¶ 15. He contacted Apple Auto to have the Vehicle repaired and sent text

messages to one of Apple Auto's managers, but his calls and text messages were not returned.

Pl.'s SOMF ¶¶ 15–16; Hernandez Aff. ¶¶ 16–17.

On or about August 15, 2017, Mr. Hernandez had the Vehicle inspected by Robert

Collins, an independent auto body expert and owner of Wreck Check Assessments of Boston,

LLC. Pl.'s SOMF ¶¶ 18–19; Hernandez Aff. ¶¶ 19–20; Collins Aff. at 1–2, ECF No. 86-4 (Aug.

29, 2019); Collins Aff. Ex. A at 3–27, ECF No. 86-4 (Robert Collins, *Vehicle Inspection and*

*Value*, Wreck Check Assessments of Boston, LLC (Aug. 25, 2017)) ("Collins Report"). As part

of the inspection, Mr. Collins reviewed the CarFax Vehicle History Report for the Vehicle,

which showed that the Vehicle had been in reported accidents on September 12, 2014, and on

May 12, 2016, and that it had been sold at auction on April 19, 2017, with a disclosure by the

seller of structural damage. Pl.'s SOMF ¶¶ 22–23; Collins Aff. ¶ 9; Collins Aff. Ex. B at 28–34,

ECF No. 86-4 (CARFAX Vehicle History Report (last updated Aug. 9, 2017)) ("CarFax

Report").

After inspecting the Vehicle and reviewing its CarFax Report, Mr. Collins determined

that the vehicle had structural damage and was "not safe to operate on public roads." Collins

---

expedite searches."); *see also United States v. Ramos*, 685 F.3d 120, 130 (2d Cir. 2012) (describing cache files as "temporary internet" files"); *Google LLC v. At Home Bondholders' Liquidating Tr.*, 722 F. App'x 1044, 1046 (Fed. Cir. 2018) (explaining that when a user visits a webpage, that page and its graphics "are often stored or 'cached' on the user's terminal, or on an intermediary server like a proxy server, for a specified period of time" so that "if the user requests the same page within that time period, the web page and [its graphics] can be loaded directly from the terminal's memory" (internal citations and quotation marks omitted)).

Report at 1. Specifically, Mr. Collins found that the vehicle had been involved in "an event that caused structural damage to the front and rear of the vehicle," that it was "not in merchantable condition," that it was "unsafe due to structural damage," and that it had "not been restored in a quality and workmanlike manner." Pl.'s SOMF ¶¶ 28–31; Collins Report at 3. He stated that "[a]ny automotive profession[al] performing a simple visual inspection can clearly see that this vehicle has been wrecked and poorly repaired," and that it had been repaired to a "Repair Level 4, which entails the use of only some of the available procedures, parts, and materials to provide the minimum level of repair that would be acceptable to the average consumer's untrained eye." Pl.'s SOMF ¶¶ 32–33; Collins Report at 3.

Based on the asking prices for similar Ford Taurus vehicles with similar damage history, Mr. Collins determined that the fair market value for the Vehicle Mr. Hernandez purchased on July 20, 2017, would have been $11,000. Pl.'s SOMF ¶ 27; Collins Report at 3.

On August 28, 2017, Mr. Hernandez returned the Vehicle to Apple Auto by leaving it in Apple Auto's parking lot. Pl.'s SOMF ¶ 36; Hernandez Aff. ¶ 23; Hernandez Aff. Ex. E at 21–24, ECF No. 86-3 (Letter from Daniel Blinn to Apple Auto and Westlake re: Isaac Hernandez—2011 Ford Taurus SHO (Aug. 29, 2017)) ("Demand Letter").

On August 29, 2017, Mr. Hernandez sent a letter through his counsel to Apple Auto and Westlake. Pl.'s SOMF ¶ 37; Hernandez Aff. ¶ 24; Demand Letter. The letter stated that Mr. Hernandez had revoked his acceptance of the Vehicle, that Apple Auto had sold him an unmerchantable and unsafe vehicle and fraudulently misrepresented the state of the vehicle on the Inspection Form in breach of the implied warranty of merchantability under Article 2 of the Uniform Commercial Code. Demand Letter.

The letter also stated that Apple Auto had violated the Truth in Lending Act and the Connecticut Unfair Trade Practices Act by stating a false down payment of $2,000 "when Mr. Hernandez only provided $500 cash" and a $1,000 trade-in allowance. *Id.* The letter demanded that Apple Auto return his $500 cash down payment and either the 2003 Volkswagen Jetta that Mr. Hernandez traded in or the $1,000 allowance that was agreed upon for the Jetta. *Id.* The letter also stated that Westlake was "advised that Mr. Hernandez disputes any further indebtedness under the retail installment contract." *Id.* The letter asserted that "Mr. Hernandez also has claims for his attorney's fees under CUTPA, TILA[, and] the federal Magnuson Moss Warranty Act." *Id.* It asserted further that any attempts by Westlake "to contact Mr. Hernandez directly in an attempt to collect th[e] disputed debt would be a violation of the Connecticut Creditor Collection Practices Act." *Id.*

On October 13, 2017, Westlake assigned the Contract back to Apple Auto. Pl.'s SOMF ¶ 39; Pl.'s SOMF Ex. 1 at 9, ECF No. 86-5 (Westlake Financial Services, Reassignment of Contract (Oct. 13, 2017)) ("Contract Reassignment").

Apple Auto never refunded any part of Mr. Hernandez's deposit or the value of his trade in, and Mr. Hernandez never made any installment payments under the Contract. Pl.'s SOMF ¶¶ 38, 40; Hernandez Aff. ¶¶ 25–26.

## B.  Procedural History

On November 3, 2017, Mr. Hernandez filed the Complaint alleging that Defendants violated the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*; the Magnuson-Moss Warranty Act (MMWA), 15 U.S.C. § 2301 *et seq.*; Article 2 of the Uniform Commercial Code; Conn. Gen. Stat. § 42a-2-101 *et seq.*; and the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110 *et seq.* Compl. ¶ 1.

On December 11, 2017, Mr. Hernandez filed a motion for default entry against Apple Auto under Federal Rule of Civil Procedure 55, for Apple Auto's failure to file a responsive pleading. Mot. for Default Entry, ECF No. 11 (Dec. 11, 2017).

On December 13, 2017, the Court granted Plaintiff's motion for default entry. Order Granting Mot. for Default Entry, ECF No. 12 (Dec. 13, 2017).

On December 14, 2017, two attorneys appeared on behalf of Apple Auto. Notices of Appearance, ECF Nos. 13–14 (Dec. 14, 2017). The next day, Apple Auto filed a motion to set aside default. Mot. to Set Aside Default, ECF No. 15 (Dec. 15, 2017).

On January 12, 2018, the two attorneys who appeared on behalf of Apple Auto entered appearance on behalf of Westlake as well. Notices of Appearance, ECF Nos. 16–17 (Jan. 12, 2018).

On January 23, 2018, the Court granted Apple Auto's motion to set aside default entry, noting that "Plaintiff indicates he does not oppose vacating the entry of default." Order, ECF No. 21 (Jan. 23, 2018).

On February 2, 2018, Defendants filed a motion to stay litigation so that the parties could move to arbitration. Mot. for Stay of Litig., ECF No. 22 (Feb. 2, 2018). Initially, Plaintiff did not oppose the motion to stay, and he indicated that he had "commenced an arbitration demand with the American Arbitration Association in accordance with the agreement to arbitrate referenced by" Defendants. Pl.'s Resp. to Mot. to Stay Litig., ECF No. 23 (Feb. 14, 2018).

On April 25, 2018, however, Plaintiff filed a second response to Defendants' motion to stay, alleging that "on March 9, 2018, the American Arbitration Association ('AAA') issued a letter declining to administer the claim due to Westlake Services' Failure to comply with AAA's policies." Pl.'s Obj. to Mot. to Stay Litig., ECF No. 25 (Apr. 25, 2018). He attached a letter from

the AAA in support of his opposition to the motion to stay. *Id.* Ex. A, ECF No. 25-1 (Apr. 25, 2018) ("AAA Letter"). The AAA Letter stated further that, "[a]ccording to R-1(d) of the Consumer [Arbitration] Rules, should the AAA decline to administer an arbitration, either party may choose to submit its dispute to the appropriate court for resolution." *Id.*

On the same day, Mr. Hernandez filed a motion for default entry under Federal Rule of Civil Procedure 55(a) against Westlake for failure to file a responsive pleading. Mot. for Default Entry, ECF No. 26 (Apr. 25, 2018). Westlake objected to the motion for default entry on the same day as well. Obj. to Default Entry as to Westlake, ECF No. 29 (Apr. 25, 2018).

Still on the same day, a third attorney entered an appearance on behalf of Defendants. Notice of Appearance, ECF No. 27 (Apr. 25, 2018).

On May 18, 2018, one of Defendants' three attorneys moved to withdraw. Mot. to Withdraw, ECF No. 30 (May 18, 2018). The Court granted that motion on May 21, 2018. Order, ECF No. 32 (May 21, 2018).

On June 1, 2018, after a telephonic status conference, the Court entered a scheduling order requiring Defendants to file responsive pleadings to the Complaint by June 15, 2018. Sched. Order, ECF No. 35 (June 1, 2018).

On June 21, 2018, Mr. Hernandez filed another motion for default entry against both Defendants for their failure to file a responsive pleading by the deadline set by the Court of June 15, 2018. Mot. for Default Entry, ECF No. 41 (June 21, 2018).

On June 25, 2018, the Court granted Plaintiff's motion for default entry against Defendants. Order, ECF No. 43 (June 25, 2018).

On the same day, Defendants filed an Answer with affirmative defenses to the Complaint. Answer, ECF No. 44 (June 25, 2018). While the document was filed as an Answer on behalf of both Defendants, it was signed only by Westlake. *Id.*

On June 25, 2018, Defendants' two remaining attorneys also jointly moved to withdraw as counsel for Defendants, stating that "[t]he attorney-client relationship has deteriorated and is not capable of being restored." Mot. to Withdraw, ECF No. 42 (June 25, 2018). Counsel also filed a motion to vacate default entry, stating that "default should be vacated to provide adequate time for the defendants to retain new counsel to appear and represent them in this matter" and noting that an Answer had now been filed. Mot. to Set Aside Order on Mot. for Default Entry at 2, 4, ECF No. 45 (June 25, 2018).

On August 17, 2018, the Court granted counsel's motion to withdraw and granted the motion to set aside default entry. Orders, ECF Nos. 48, 49 (Aug. 17, 2018).

On August 27, 2018, Mr. Hernandez filed another motion for default entry against both Defendants, contending that "[d]espite notice to the defendants that failure to secure successor counsel may result in a default being entered against them, no successor counsel has appeared." Mot. for Default Entry, ECF No. 50 (Aug. 27, 2018).

On October 17, 2018, a new attorney appeared on behalf of Westlake. Notice of Appearance, ECF No. 51 (Oct. 17, 2018). The next day, Westlake filed an objection to Plaintiff's motion for default against it. Obj. to Mot. for Default Entry, ECF No. 52 (Oct. 18, 2018).

On October 29, 2018, the Court found as moot Plaintiff's fourth motion for default entry. Order, ECF No. 53 (Oct. 29, 2018).

On November 2, 2018, Mr. Hernandez moved for default entry again, this time only as to Apple Auto, noting that Apple Auto still had not entered an appearance. Mot. for Default Entry, ECF No. 54 (Nov. 2, 2018).

On June 25, 2019, the Court denied Plaintiff's fifth motion for default entry "as Defendant ha[d] appeared and answered." Order, ECF No. 81 (June 25, 2019). Mr. Hernandez moved again for default entry against Apple Auto on July 1, 2019, however, stating that "there is no record of appearance on file for Apple Auto since the withdrawal of its counsel, and a limited liability company cannot appear in court pro se or by an individual who is not an attorney." Mot. for Default Entry, ECF No. 82 (July 1, 2019).

On July 2, 2019, the Court granted Plaintiff's sixth motion for default entry against Apple Auto. Order, ECF No. 83 (July 2, 2019).

On September 6, 2019, Mr. Hernandez filed a motion for default judgment as to Apple Auto, together with a motion for summary judgment against Westlake. Mot. for Default J. as to Apple Auto, ECF No. 86 (Sept. 6, 2019); Mot. for Summ. J. as to Westlake, ECF No. 86-1 (Sept. 6, 2019). In support of these motions, Mr. Hernandez filed a memorandum of law, a statement of material facts, and a declaration by his attorney. Mem. of Law in Supp. of Mot. for Default J. and Mot. for Summ. J., ECF No. 86-2 (Sept. 6, 2019) ("Hernandez Mem."); Pl.'s SOMF; Blinn Decl., ECF No. 86-6 (Sept. 6, 2019). He also attached his own affidavit accompanied by five exhibits, Hernandez Aff. at 5–24, ECF No. 86-3; and an affidavit from Robert Collins, an independent auto body expert, along with two exhibits, Collins Aff. at 3–34, ECF No. 86-4.[4]

---

[4] Mr. Hernandez filed his motion for summary judgment against Westlake twice on the same day: once along with the motion for default judgment against Apple Auto, *see* ECF No. 86, and once as a separate filing, *see* ECF No. 87. Since the motions and their exhibits are identical, the Court will refer to ECF No. 86 for clarity.

On November 12, 2019, Westlake filed an opposition to Plaintiff's motion for summary judgment. Def.'s Opp'n to Summ. J., ECF No. 90 (Nov. 12, 2019) ("Westlake Mem."). Westlake attached an affidavit from its Litigation Manager, John Schwartz, Schwartz Aff., ECF No. 90-1 (Oct. 28, 2019); and a California state appellate court decision, *Duran v. Quantum Auto Sales, Inc.*, No. G053712, 2017 WL 6334220 (Cal. Ct. App. Dec. 12, 2017), ECF No. 90-2. Westlake only responded to Mr. Hernandez's claims regarding assignee liability and did not make any argument as to Mr. Hernandez's underlying claims against Apple Auto.

On November 13, 2019, Westlake also moved for summary judgment against Mr. Hernandez, and submitted a memorandum of law identical to its objection to Mr. Hernandez's motion for summary judgment, and the same affidavit and California state appellate decision. *See* Def.'s Cross Mot. for Summ. J., ECF No. 91 (Nov. 13, 2019); Mem. of Law in Supp. of Cross Mot. for Summ. J., ECF No. 91-1 (Nov. 13, 2019); Schwartz Aff., ECF No. 91-2 (Oct. 28, 2019); *Duran*, 2017 WL 6334220, ECF No. 91-3.

On December 4, 2019, Mr. Hernandez filed a reply in support of his motion for summary judgment, which also served as his response to Westlake's cross-motion for summary judgment. Reply and Obj. to Cross Mot. for Summ. J., ECF No. 94 (Dec. 4, 2019) ("Hernandez Reply").

On April 16, 2020, the Court held a telephonic hearing on the cross-motions for summary judgment and the motion for default judgment against Apple Auto. Minute Entry, ECF No. 97 (Apr. 16, 2020).

On May 18, 2020, the Court granted the motion for default judgment against Apple and awarding Mr. Hernandez $24,300 in damages, fees, and costs. Default J. Order at 1–2, ECF No. 100.

On the same day, the Court issued an order certifying three questions to the Connecticut Supreme Court: (1) When is the limit on assignee liability, "the amount of indebtedness then outstanding," determined under Conn. Gen. Stat. § 52-572g?; (2) Can an assignee avoid liability under Conn. Gen. Stat. § 52-572g by re-assigning the promissory note, contract or other instrument back to the seller? If so, by when must the assignee reassign the loan to avoid liability?; and (3) If a retail installment contract includes the language mandated by 16 C.F.R. § 433, the FTC Holder Rule, is the assignee liability under this incorporated contractual language cumulative to the statutory liability under Conn. Gen. Stat. § 52-572g? Certification Order at 12–13.

On May 7, 2021, the Connecticut Supreme Court filed an opinion answering the certified questions. *Hernandez*, 338 Conn. 803.

On May 12, 2021, the Court directed the parties to file supplemental briefs addressing the impact of the Connecticut Supreme Court's opinion on the cross-motions for summary judgment. Order, ECF No. 107 (May 12, 2021).

On June 18, 2021, Mr. Hernandez filed a supplemental brief. Pl's Suppl. Br., ECF No. 108 (June 18, 2021) ("Hernandez Suppl. Br.").

On June 25, 2021, Westlake filed a supplemental brief in which it argued for the first time before the Court that § 52-572g is preempted by the FTC's Holder Rule. Suppl. Mem. of Law, ECF No. 113 (June 25, 2021) ("Westlake Suppl. Br.").

On June 29, 2021, Mr. Hernandez filed a reply to Westlake's supplemental brief. Pl.'s Reply to Westlake Services, LLC's Suppl. Br., ECF No. 114 (June 29, 2021) ("Hernandez Suppl. Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated

speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967), and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

Mr. Hernandez asserts three claims against Westlake: (1) breach of the implied warranty of merchantability in violation of Connecticut General Statutes § 42a-2-314 (Count Two), Compl. ¶¶ 38–46; (2) revocation of acceptance under Connecticut General Statutes § 42a-2-608 (Count Three), *id.* ¶¶ 47–52; and (3) violations of CUTPA (Count Four), *id.* ¶¶ 53–57.

He contends that Westlake is subject to these claims and defenses, which he also asserted against Apple Auto, under Connecticut General Statutes § 52-572g and the terms of the contract.

*Id.* ¶¶ 46, 52, 57. Mr. Hernandez seeks actual and punitive damages as well as attorney's fees and costs under the MMWA and CUTPA. *Id.* ¶¶ 35, 44–45, 50–51, 56.

### A. Assignee Liability

As described above, Westlake did not participate directly in the transaction between Mr. Hernandez and Apple Auto. After Mr. Hernandez purchased the vehicle, Apple Auto assigned the contract, including Mr. Hernandez's obligation to pay, to Westlake. Mr. Hernandez nonetheless argues that Westlake is liable alongside Apple Auto for the injuries alleged in Counts Two, Three, and Four. Compl. ¶¶ 46, 52, 57. Mr. Hernandez points to two distinct bases for holding the assignee of an installment contract liable for claims arising out of the seller's conduct: (1) Connecticut General Statutes § 52-572g and (2) the FTC's Holder Rule, 16 C.F.R. § 433.[5] Hernandez Mem. at 17.

Section 52-572g provides that "[a]ny holder in due course of a promissory note, contract or other instrument . . . executed by a buyer in connection with a credit transaction covering consumer goods . . . shall be subject to all of the claims and defenses which the buyer has against the seller arising out of the transaction." Conn. Gen. Stat. § 52-572g(a). In these circumstances, the holder's liability is "limited to the amount of indebtedness then outstanding in connection with the credit transaction." *Id.* The provision also requires that the buyer make "a prior written demand on the seller" before initiating legal action. *Id.*

The FTC Holder Rule similarly requires that all consumer credit contracts contain a notice stating: "ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST

---

[5] In addition to disputing its liability under these provisions, Westlake argues that it is not liable under a common law theory of assignee liability. Westlake Mem. at 6–8. Because Mr. Hernandez does not contend that Westlake is liable under a common law theory, Hernandez Reply at 4, the Court will not address Westlake's arguments on this issue.

THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH

THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT

EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER." 16 C.F.R. § 433.2.

Thus, both provisions make the holder of an installment contract liable—subject to

certain limits—for any claims that the buyer could bring directly against the seller. Westlake

contends that neither provision applies and that it is not liable for claims that Mr. Hernandez has

brought against Apple Auto. Westlake Mem. at 8.

The Court will address each provision in turn.

### 1.  Connecticut General Statutes § 52-572g

Mr. Hernandez argues that Westlake is liable under § 52-572g for the amount of

indebtedness under the contract at the time Mr. Hernandez sent his demand letter to Apple Auto

and Westlake. Hernandez Suppl. Br. at 3.

Westlake offers several reasons why it cannot be held liable under § 52-572g for the

amount of Mr. Hernandez's indebtedness. Most importantly, Westlake argues in its supplemental

brief that § 52-572g is preempted by the Holder Rule because of conflict between the two rules'

limits on assignee liability. *See* Westlake Suppl. Br. at 3–11. In its original summary judgment

briefing, Westlake argued that it was not liable because it had reassigned the contract back to

Apple Auto and, relatedly, because Mr. Hernandez no longer had any outstanding debt to

Westlake. *See* Westlake Mem. at 4, 9.

The Court will address each of these arguments in turn.

### a.  The Preemption Doctrine

As a threshold matter, Westlake's preemption argument is procedurally improper. After

failing to raise the issue in its original summary judgment briefing before this Court, Westlake

argued preemption for the first time in its briefing before the Connecticut Supreme Court on the certified questions. *See Hernandez*, 338 Conn. at 814 n.7. The Connecticut Supreme Court declined to address this argument as beyond the scope of the certified questions, noting that this Court was better situated to consider Westlake's preemption defense. *See id.* ("The plaintiff further contends, and we agree, that the District Court is perfectly well situated to decide questions of federal preemption and would not have sought this court's guidance as to the meaning of § 52-572g if it believed that the statute was preempted by 16 C.F.R. § 433.2."). Westlake now raises the argument for the first time before this Court in its supplemental brief.

The Second Circuit has established that "new arguments may not be made in a reply brief." *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999); *see also Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."). The same principle applies to the supplemental briefing in this case. Preemption is not an argument raised in response the Connecticut Supreme Court's opinion; it is merely an alternative defense to Mr. Hernandez's claims of liability under § 52-572g. A party may not at this late stage adopt a new legal theory that could have been presented earlier. This case illustrates effectively the rationale behind this rule: if Westlake had raised a successful preemption argument in its original summary judgment briefing, the Court could have avoided the expenditure of time and judicial resources involved in certifying questions to the Connecticut Supreme Court.

Even if the Court were to reach the preemption issue, it would reject Westlake's arguments. Westlake contends that § 52-572g is preempted because it "expands" the Holder Rule's cap on claims that arise from the seller's conduct. Westlake Suppl. Br. at 9–10. The Holder Rule establishes that "recovery hereunder by the debtor shall not exceed amounts paid by

the debtor," while § 52-572g allows recovery up to "the amount of indebtedness then outstanding." Westlake Suppl. Br. at 9–10. According to Westlake, "the Court would be essentially eviscerating the Holder Rule" if it permitted Mr. Hernandez to recover under § 52-572g more than he actually paid under the contract. *Id.* at 5.

The Court disagrees.

"In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). That assumption is confirmed in this case by the staff guidelines issued by the FTC shortly after the Holder Rule was enacted, which state that the Rule's "limitation on affirmative recovery does not eliminate any other rights the consumer may have as a matter of local, state, or federal statute." Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 41 Fed. Reg. 20022, 20023 (May 14, 1976).

The Holder Rule's limitation applies to any "recovery hereunder." The FTC's guidance clarifies that these words "refer specifically to a recovery under the Notice." *Id.* The limit therefore does not apply to recovery authorized by another statute, such as § 52-572g. *See id.* ("If a larger affirmative recovery is available against a creditor as a matter of state law, the consumer would retain this right."). The FTC's guidance strongly indicates that Congress, in enacting the statute that created authority for the Holder Rule, did not intend to displace state laws that

19

provided even more protection for consumers.[6] *See Wyeth v. Levine*, 555 U.S. 555, 576–77 (2009) ("While agencies have no special authority to pronounce on pre-emption absent delegation by Congress, they do have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (internal quotation marks omitted)).

The authorities cited by Westlake do not dictate a different conclusion.

First, Westlake invokes a 2019 Confirmation of Rule in which the FTC declined to permit buyers to recover attorney's fees under the Holder Rule when they rose above the "amounts paid" limit. *See* Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 84 Fed. Reg. 18711 (May 2, 2019). The FTC clarified that "if a federal or state law separately provides for recovery of attorneys' fees independent of claims or defenses arising from the seller's misconduct, nothing in the Rule limits such recovery." *Id.* at 18713. Accordingly, Westlake argues, when a claim does arise from the seller's misconduct, the Holder Rule limits recovery. Westlake Suppl. Br. at 5, 10. The 2019 Confirmation of Rule did not, however, address the circumstances presented here, when state law provides an independent basis for allowing recovery against the holder. Thus, the Court cannot conclude from the FTC's statements on this distinct issue that the Holder Rule preempts § 52-572g.

Second, Westlake cites a recent California Court of Appeals decision holding that "recovery under the Holder Rule is capped to amounts paid regardless of additional recovery that

---

[6] Contrary to Westlake's assertions, § 52-572g is not necessarily more protective of consumers than the Holder Rule. In this case, when Mr. Hernandez has paid only $1,500 under the contract and almost all of the debt is outstanding, § 57-572g will permit a greater recovery. If, however, Mr. Hernandez had paid off all of the debt and there was no outstanding balance, § 57-572g would cap Westlake's liability at $0, while the Holder Rule would permit Mr. Hernandez to recover the entire amount that he paid. Because § 57-572g does not categorically raise the limit set by the Holder Rule, it is even less likely to conflict with Congress's intent in providing the FTC with the authority to promulgate the Holder Rule.

may be independently available under state or local law." *Lafferty v. Wells Fargo Bank, N.A.*, 25 Cal. App. 5th 398, 413 (2018). Westlake argues based on this language that "independent" state and local claims are not subject to the Holder Rule's limitation only if they are based on the wrongful conduct of the holder rather than the seller. Westlake Suppl. Br. at 8–9. Like the FTC Confirmation of Rule discussed above, *Lafferty* did not address claims preserved by a state law analogous to the Holder Rule. Moreover, *Lafferty* was recently disapproved by the California Supreme Court in *Pulliam v. HNL Automotive Inc.*, 509 P.3d 998, 1012 (Cal. 2022).

Accordingly, the Court concludes that Mr. Hernandez can assert claims against Westlake under § 52-572g up to "the amount of indebtedness."

### b.   Reassignment of the Contract

Westlake argued in its original summary judgment briefing that it was not liable under § 52-572g because it had reassigned the contract to Apple Auto before Mr. Hernandez filed his Complaint. Westlake Mem. at 4. The Connecticut Supreme Court rejected this argument in its opinion answering the certified questions. The court held that § 52-572g authorized claims only against a person currently "in legal possession of the instrument, not a person formerly in possession of it." *Hernandez*, 338 Conn. at 823. The court, however, also clarified that liability attaches under § 52-572g "once written demand is made on the seller." *Id.* at 824. Here, Westlake reassigned the contract back to Apple Auto on October 13, 2017, almost two months after Mr. Hernandez sent his demand letter on August 29, 2017.

Accordingly, Westlake qualifies as a "holder in due course" under § 52-572g.

### c.   "Amount of Indebtedness then Outstanding" Under § 52-572g

Section § 52-572g limits an assignee's liability to "the amount of indebtedness then outstanding in connection with the credit transaction." Westlake also argued in its original

summary judgment briefing that this limit is zero because Westlake had reassigned the contract to Apple Auto and Mr. Hernandez no longer owed any amount to Westlake. Westlake Mem. at 9–10. The Connecticut Supreme Court rejected this argument as well, holding that "the amount of indebtedness then outstanding" is determined at the time "when the buyer makes written demand on the seller." *Hernandez*, 338 Conn. at 821.

Accordingly, because Westlake was the holder of the contract at the time of Mr. Hernandez's demand letter, the § 52-572g limit is equal to the debt outstanding on the contract at that time.

### 2. The FTC Holder Rule

Mr. Hernandez argues that, in addition to its liability under § 52-572g, Westlake is liable under the Holder Rule for the amount he paid under the contract.

Westlake, in its original summary judgment briefing, argued that Mr. Hernandez has not asserted a claim under the Holder Rule because he did not mention the rule by name or cite the relevant regulatory provision in his complaint. Westlake Mem. at 10–11, 15. Westlake also argues, as it did with respect to § 52-572g, that the Holder Rule does not apply because it reassigned the note to Apple Auto before Mr. Hernandez initiated his lawsuit. *Id.* at 6. Finally, Westlake contends that it is not liable for any amount under the Holder Rule because no money was paid to it under the contract. *Id.* at 14.

The Court will address each of these arguments in turn.

### a. Pleading a Claim Under the Holder Rule

Mr. Hernandez argues that he sufficiently pled liability under the Holder Rule because he asserted claims against Westlake under the Contract, which contained the notice required by the Holder Rule. Hernandez Mem. at 17.

The Court agrees.

Mr. Hernandez's Complaint asserted that Westlake was "subject to these claims and to Plaintiff's defenses under the Contract in accordance with the terms of the Contract." Compl. ¶¶ 46, 52, 57. The Contract, meanwhile, contains the precise language specified by the Holder Rule. *See* Contract at 18, ECF No. 87-2. This contractual notice affords the buyer all of the protection guaranteed by the Holder Rule; the buyer need not separately cite the relevant regulatory provision to state a claim for assignee liability under the Holder Rule.

### b.  Reassignment of the Contract

No Court of Appeals or district court within the Second Circuit has addressed whether a holder's reassignment of a loan prior to the filing of a lawsuit negates that holder's liability under the Holder Rule. As discussed above, the Connecticut Supreme Court addressed this issue with respect to § 52-572g, but the court's opinion relied primarily on the text of that provision and sheds little light on the analogous question under the Holder Rule.

Mr. Hernandez points the Court to a recent California intermediate appellate court decision that addressed the effect of a holder reassigning a loan. *Duran v. Quantum Auto Sales, Inc.*, No. G052968, 2017 WL 6333871 (Cal. Ct. App. Dec. 12, 2017), also involved a plaintiff who bought a used car and later sued both the auto dealer and the company which was assigned the debt. In that case, the defendant debt holder reassigned its interest in the Contract back to the defendant auto dealer after the plaintiff filed her lawsuit but before the jury rendered its verdict. *Id.* at *14. The court determined that the assignee defendant could not avoid liability in this manner, noting that the assignee "cite[d] to no legal authority, and [the court] found none, excusing a 'holder' from liability simply because it reassigned the debt instrument to someone else before judgment was entered in the consumer's case." *Id.* Moreover, the assignee "d[id] not

23

suggest what policy or purpose would be served by giving a creditor-assignee such an easy exit strategy." *Id.* at \*16.

> The [Holder Rule] notice provides "any holder" is subject to all claims and defenses the consumer has against the original seller. "Therefore, any effort by an intermediary assignee to play 'hot potato' with a consumer credit contract will not be effective. If a holder acquired the contract from the seller, the holder is potentially liable to the consumer for return of all monies it received under the contract. The FTC Holder Rule seeks to place the burden on the seller and its assignee."

*Id.* (quoting David A. Szwak, *The FTC "Holder" Rule*, 60 Consumer Fin. L.Q. Rep. 361, 363 (2006)); *cf. In re Barker*, 306 B.R. 339, 351 (Bankr. E.D. Cal. 2004) (rejecting a financing company's argument that it was not subject to a debtor's claims or defenses, noting that it did not "appear that an assignee or purchaser of an account in a consumer transaction can contract its way out of [the Holder Rule]").

Similarly, in *Associates Home Equity Services, Inc. v. Troup*, 778 A.2d 529, 542–43 (N. J. App. Div. 2001), a New Jersey appellate court rejected a contract holder's argument that it was not liable under the Holder Rule because it had reassigned the contract. The court reasoned that "[t]he clear and unambiguous language of the [Holder] Rule notifies all potential holders that, if they accept an assignment of the contract, they will be 'stepping into the seller's shoes.' Thus, the creditor-assignee becomes subject to any claims or defenses the debtor can assert against the seller." *Id.* at 542. "We cannot accept the proposition that the FTC contemplated that such result would not attach simply because of a subsequent assignment of the loan, especially when, as here, it is claimed that [the financing company] actively participated with [ ] the seller[] in placing the loan with the [buyer]." *Id.* at 543.

The Court agrees with Mr. Hernandez that a loan holder remains liable as an assignee even after reassigning the loan.

The FTC's Holder Rule operates to provide a consumer recourse against more sophisticated parties, such as, quintessentially, a financing company that is in a better position to assess and absorb the risks associated with a particular loan than the consumer. The courts that have opined on the issue have found that it is consistent with the policy goals of the Holder Rule, as well as analog state assignee liability laws, to hold assignees liable regardless of whether they are assigned the loan at the time a consumer becomes aware of seller misconduct or files a lawsuit. This Court agrees.

Accordingly, Westlake is liable as the assignee under the Holder Rule.

### c.   "Amounts Paid" Under the Holder Rule

Westlake contends that, even if it is liable as assignee, Mr. Hernandez cannot recover any damages under the Holder Rule because Mr. Hernandez never made any payments to Westlake. Westlake Mem. at 9. Mr. Hernandez responds that the phrase "amounts paid by the debtor hereunder" in the Holder Rule notice refer to any amount paid under the contract, regardless of whether it is paid to the seller or the assignee.

The Court agrees with Mr. Hernandez.

The text of the Holder Rule notice refers generally to "amounts paid" under the contract. The notice provides no indication that this amount is limited to payments made to the assignee. As with the reassignment issue, Westlake's position would permit holders to easily defeat liability by reassigning the contract to another entity that has received no payments from the buyer.

Accordingly, the Court concludes that Westlake's potential liability under the Holder Rule is limited to the amount Mr. Hernandez paid to any party under the contract. *See, e.g.*, *Barrett v. Brian Bemis Auto World*, 408 F. Supp. 2d 539, 547 (N.D. Ill. 2005) ("Assignees of

[retail installment contracts] may be held liable up to the amount paid under the credit contract for any valid claims against the seller.").

### B. Westlake's Substantive Liability

The Court has concluded that Westlake is liable under both § 52-572g and the FTC Holder Rule—subject to each provision's respective recovery limit—for all claims and defenses Mr. Hernandez could assert against Apple Auto arising out of the transaction. Mr. Hernandez has asserted three claims against both Apple Auto and Westlake: (1) breach of the implied warranty of merchantability in violation of Connecticut General Statutes § 42a-2-314 (Count Two), Compl. ¶¶ 38–46; (2) revocation of acceptance under Connecticut General Statutes § 42a-2-608 (Count Three), *id.* ¶¶ 47–52; and (3) violations of CUTPA (Count Four), *id.* ¶¶ 53–57.

Westlake has not offered any defense to its or Apple Auto's substantive liability for each of these claims. *See generally* Westlake Mem.; Westlake Suppl. Br. Westlake also does not dispute the facts as presented by Mr. Hernandez. *See* Westlake Mem.; Hernandez Mem. at 2 (stating that the parties agreed after two telephonic pre-settlement conference with Magistrate Judge Garfinkel "that there [a]re no contested issues of fact between them and that they would seek an adjudication of the scope of Westlake's assignee liability by means of a summary judgment motion").

In the prior Order granting Mr. Hernandez's motion for default judgment, the Court determined that that "the [plaintiff's] allegations establish [the defendant's] liability as a matter of law" with respect to these three claims. Default J. Order, ECF No. 100, at 12, 17–27 (alteration in original) (quoting *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011)). Section 52-572g and the Holder Rule establish that, because Apple Auto is liable for these claims and they arise out of the transaction, Westlake is also liable. Accordingly,

the Court will grant Mr. Hernandez summary judgment on his claims against Westlake for breach of the implied warranty of merchantability (Count Two); revocation of acceptance under Connecticut General Statutes § 42a-2-608 (Count Three); and violations of CUTPA (Count 4).

### C. Damages

The Court previously awarded damages to Mr. Hernandez against Apple Auto for these claims. Default J. Order at 38. Although Apple Auto did not appear and defend against Mr. Hernandez's claims, the Court was nonetheless obligated to determine the amount of damages to be awarded based on the evidence presented. *See Chance v. Karmacharya*, No. 3:14-cv-01111 (JAM), 2017 WL 5515951, at *2 (D. Conn. Mar. 20, 2017) ("A court may not 'just accept [a plaintiff's] statement of the damages,' even in a default judgment." (quoting *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997))).

Westlake contends that, even if it is liable for damages, "[t]hat amount cannot be determined until trial." Westlake Suppl. Br. at 14. But Westlake presents no evidence of its own to dispute Mr. Hernandez's evidence of the amounts involved or Apple Auto's conduct. *See supra* note 1. Accordingly, there is no genuine dispute of material fact as to damages.

In granting default judgment against Apple, the Court awarded Mr. Hernandez actual damages of $1,500, incidental damages of $650, attorney's fees and costs in the amount of

$18,000,[7] and punitive damages in the amount of $2,150.[8] Default J. Order at 38. These amounts total $22,300.

Westlake's liability, however, is limited by § 52-572g and the Holder Rule. Section 52-572g permits Mr. Hernandez to recover up to the amount of indebtedness as of the date he submitted his demand letter. *See Hernandez*, 338 Conn. at 821. The Holder Rule, meanwhile, permits a recovery up to the amount Mr. Hernandez paid on the contract.

In answering the certified questions, the Connecticut Supreme Court held that these amounts are cumulative. *Id.* at 830. Accordingly, Mr. Hernandez may recover no more than the sum of the amount he paid and the amount of indebtedness. "This means that, in cases such as the present one, in which the consumer has made no payments under the contract, the consumer's recovery may be greater than his or her actual losses." *Id.*

Mr. Hernandez contends that he paid $2,000 on the contract. Hernandez Suppl. Br. at 3. His Rule 56(a)(1) statement, however, states clearly that Mr. Hernandez's payments were limited to a $500 down payment and a trade-in allowance of $1,000. Pl.'s SOMF ¶¶ 2–3, 5–7. Accordingly, the Court will award $1,500 in actual damages paid under the contract, just as it did against Apple Auto. *See* Default J. Order at 38.

---

[7] In his original summary judgment briefing, Mr. Hernandez sought attorney's fees under TILA, CUTPA, and the MMWA (MMWA), 15 U.S.C. § 2301, *et seq.* Hernandez Mem. at 22. Mr. Hernandez has not asserted a TILA claim against Westlake. Compl. ¶ 29–35. Westlake also is not liable for attorneys' fees and costs under the MMWA because the MMWA does not permit recovery against assignees. *See King v. A Better Way Wholesale Autos, Inc.*, No. 3:17-cv-885 (AWT), 2018 WL 5993925, at *3 (D. Conn. Sept. 10, 2018) ("[T]he plain text of the MMWA prohibits assignee liability where the assignee is not the person who created the written warranty. Although the Holder Rule normally permits an individual to assert all claims and defenses against an assignee that he or she could have asserted against the assignor, regulations cannot trump the plain language of statutes." (internal quotation marks omitted)). Nonetheless, the Connecticut Supreme Court has established that a plaintiff who establishes a CUTPA claim is entitled to attorney's fees. *See Barco Auto Leasing Corp. v. House*, 202 Conn. 106, 120 (1987) ("Since CUTPA expressly permits the court to award 'costs and reasonable attorneys' fees based on the work reasonably performed by an attorney[,]' the [counterclaim plaintiffs] are clearly entitled to such fees." (citation omitted)).

[8] The Court also awarded $2,000 in statutory damages under TILA. As noted above, Mr. Hernandez does not assert a TILA claim against Westlake.

Mr. Hernandez also contends that the amount outstanding on August 29, 2017, was $12,442.13. Hernandez Suppl. Br. at 3. Mr. Hernandez calculated this amount by (1) calculating the annual interest cost of $2,147.18 ($12,206.82 amount financed multiplied by the 17.59% annual interest rate); (2) dividing that amount by 365 to calculate a daily interest cost of $5.8827; and (3) multiplying the daily interest cost by the 40 days from the execution of the contract on July 20, 2017, to the demand letter on August 29, 2017.

The Court agrees.

This calculation method is consistent with the terms of the contract, which provides for 41 monthly payments of $400.93 beginning on September 3, 2017.[9] *See* Contract at 15.

Accordingly, Westlake's total liability limit under both § 52-572g and the Holder Rule is $13,942.13. Because Westlake's liability under Counts Two, Three, and Four, including attorney's fees and costs, exceeds that amount, the Court will award Mr. Hernandez $13,942.13 in damages against Westlake.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Hernandez's motion for summary judgment against Westlake is **GRANTED**, and Westlake's motion for summary judgment is **DENIED**.

Summary judgment is granted to Mr. Hernandez as to Westlake's liability for breach of the implied warranty of merchantability, revocation of acceptance under Connecticut General Statutes § 42a-2-608, and for CUTPA claims based on Apple Auto's violation of the Truth in Lending Act, negligent misrepresentation of the safety and merchantability of the car and its

---

[9] Although the Contract states that the lender "will figure the Finance Charge on a daily basis," interest charges appear to be calculated monthly beginning with the date of the first scheduled payment. *See* Hernandez Aff. Ex. C, at 17.

failure to comply with safety inspection requirements under Connecticut General Statutes § 14-62(g).

As the Court ordered with respect to Apple Auto, the Contract is canceled because Mr. Hernandez validly revoked acceptance of the Vehicle.

The Court determines that actual damages amount to $1,500, incidental damages amount to $650, attorney's fees and costs amount to $18,000, and punitive damages amount to $2,150. These damages, fees, and costs total $22,300. But because Westlake's liability is capped at $13,942.13 under § 52-572g and the Holder Rule, the Court awards $13,942.13 against Westlake.

The Clerk of Court is respectfully directed to enter judgment accordingly, and then close this case.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of September, 2020.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE